**Ray MARSHALL, Secretary of Labor**

v.

**LOCAL LODGE, 1784, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO.**

Civ. A. No. M–80–1588.

United States District Court,
D. Maryland.

Feb. 10, 1981.

Marshall H. Harris, Regional Sol., Philadelphia, Pa., Mark D. Newberger, Baltimore, Md.; and Russell T. Baker, Jr., U. S. Atty. and Andre Davis, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Joel A. Smith, and Mary Ellen Signorille, of Lutherville, Md., for defendant.

MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This action was instituted by the Secretary of Labor, pursuant to Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 401 *et seq.* The Secretary seeks an order declaring defendant's December 9, 1979, election for officers of Local Lodge 1784 to be void, and directing Local Lodge 1784 to conduct a new election under the Secretary's supervision. LMRDA § 402(c), 29 U.S.C. § 482(c). The Secretary contends that by its negligent preparation for, and conduct of, that election, Local Lodge 1784 denied certain of its members an opportunity to vote in the election, and that the number of persons deprived of the right to vote was great enough to have affected the election's outcome.

Defendant has moved for summary judgment on two grounds: (1) the facts and circumstances alleged by the Secretary are insufficient as a matter of law to establish a violation of the union members' right to vote; and (2) the Secretary lacks jurisdiction to contest the positions of delegates to District Lodge No. 12 because they are not "officers" within "labor organizations" within the meaning of the Act.[1] LMRDA §§ 3(i) and 3(n), 29 U.S.C. §§ 402(i) and (n).

Under Rule 56, Fed.R.Civ.P., the party moving for summary judgment must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See, e. g., Charbonnages De France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir. 1967). The moving party's burden to demonstrate the absence of an issue of material fact is substantial. Summary judgment may be granted "only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts." *Morrison v. Nissan Co., Ltd.,* 601 F.2d 139, 141 (4th Cir. 1979). In determining whether the moving party has made the necessary factual and legal showing, the court must evaluate the pleadings and other materials on file in the light most favorable to the party opposing the motion, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and give the nonmoving party "the benefit of all favorable legal theories invoked by the evidence so considered." *Charbonnages De France v. Smith,* 597 F.2d at 414. When the materials of record are viewed under this standard, the court cannot say that the Secretary would be unable, as a matter of law, to establish a violation of the union members' right to vote.

The Secretary's factual allegations (*see* Paper No. 36, at 3–10) support the inference that there was inadequate preparation for conducting the election and that the election was conducted in such a manner so as actively to discourage union members from voting. Without restating the Secretary's factual allegations in their entirety the following allegations merit highlighting.

In preparation for the December 9, 1979, election, defendant held a nominating meeting on November 11, 1979. At this meeting, defendant failed to comply with Article V, Section 5 of its By-Laws requiring the president, at the conclusion of the meeting, to appoint a committee of three election tellers to conduct the election proceedings.

At the time of the election, defendant had approximately 1500 members in good

---

1. Defendant concedes that the positions of president, vice-president, recording secretary, financial secretary, treasurer, sentinel, conductor, and three members of the board of trustees are "officers" within the meaning of the Act. These positions are specifically set out in the constitution of the International Association of Machinists and Aerospace Workers, dated July 7, 1977, as officers, Article C, Section 2, and defendant does not contend that these positions are not positions within "labor organizations."

For the purpose of this action, the Secretary has agreed that positions of delegate to board of directors 3006 Corporation, grievance committee at large, delegates to the Maryland and District of Columbia State Council of Machinists, grievance committee members, and all plant committee members are not subject to challenge. The court, therefore, expresses no opinion as to these positions.

standing who were eligible to vote. Defendant set aside voting hours from 9:00 a. m. to 12:00 a. m. One polling area was rented. It consisted of the lobby of the Edmundson High School, and was 52 feet by 40 feet in area.

Between the nomination meeting and the election, then president Benjamin Barnes (now deceased) informally appointed an election committee. The duties and responsibilities of the election committee members were not explained until these individuals arrived at the voting area on the morning of the election. Moreover, the election committee members did not meet as a group until the morning of the election.

William Reed was appointed chairman of the election committee and did not hold any meetings with the committee members. Reed did not serve as chairman because he became ill on the day of the election. Without prior notice, Leonard M. Pruitt was appointed chairman of the election committee on the morning of election day. Prior to his appointment, Pruitt had never discussed the election teller responsibilities with Reed.

Although the polls opened at approximately 9:00 a. m., the security guards who had been hired to maintain order did not arrive until after 10:00 a. m. When they did arrive, a third of the election was completed and the guards failed to clear the voting area of those persons who had already voted.

The election tellers, who were responsible for signing-in voters, did not request union member identification from each individual who signed-in to vote. The tellers did not inform voters that they were required to sign-in and register prior to voting. As a result, many union members simply began waiting in lines when they arrived to vote. It was only after they had waited in the voting lines that they were told they would have to leave their place in line and register at the sign-in table.

All voters who were not retirees cast their ballots for line officers on six voting machines. Some of these voters, in addition to voting on a line officer machine, were required to vote on a different machine for plant committee candidates. Many members got into the wrong voting lines due to lack of instructions from the election committee, and during the election the machinery provided by Snyder & Son Automatic Voting Machines, Inc., malfunctioned.

Persons who were not union members were permitted to congregate in the voting area. Various candidates were walking around the voting area and talking to voters prior to these voters casting their ballots.

The voting lines were lengthy and extended from the voting machines around the sign-in table in the front of the election area. The lines also extended into the auditorium area on one of the sides of the voting area. The lines were disorganized and contributed to long delays in voting.

The doors to the polling area were locked at 12:00 a. m. At that time, there were over 100 union members who had not yet voted. These persons were allowed to vote, and the balloting did not conclude until 2:30 p. m.

At the hearing on defendant's motion it was established that out of the 1500 union members who were eligible to vote, 617 members actually registered to vote at the polling place. The ballot form was complicated, there being 104 candidates for 23 elective positions. According to the Secretary, if the 617 potential voters took only 15 seconds per elective position to mark their ballots [2] the voting would have taken over five hours (Plaintiff's Motion Ex. 2, Chart C). If the entire membership had turned out to vote, using the same formula, the election would have taken over twelve hours (Plaintiff's Motion Ex. 2, Chart B). The union, however, allotted only three hours for voting.

**2.** This calculation is based on 14 elective positions because not all union members were eligible to vote for all 23 elective positions.

Of the 617 union members who registered to vote at the polling place only 557 actually voted.[3] It appears, therefore, that 59 union members who registered to vote did not cast their ballots.[4] The Secretary has identified 41 of these union members, and has introduced evidence that there were other union members who traveled to the polling place with the intention of voting but who did not even register due to the disorganized conditions at Edmundson High School (Affidavit of Charles Sindall, Paper No. 36). For the purpose of this motion, therefore, over ten percent of those union members who demonstrated a clear intention to vote on December 9, 1979, did not vote because of the conditions at the polling place.

Defendant presses two arguments in support of its contention that the above-recited facts do not state a violation of the LMRDA. Defendant first argues that because it did not engage in conduct expressly prohibited by the LMRDA, or fail to do something the Act expressly required, this court should not interfere in internal union affairs. Defendant's second argument is that it is only required to provide a "reasonable" opportunity to vote and, it having done so, there has been no violation of the union member's right to vote in union elections. The court cannot concur in defendant's overly restrictive view of its statutory duties.

The union member's substantive rights under the LMRDA are found in Title I and Title IV. *See generally* J. Bellace & A. Berkowitz, *The Landrum-Griffin Act* (1979). Title I of the LMRDA establishes certain basic rights, including the equal right to nominate candidates and to vote in union elections. LMRDA § 101(a)(1), 29 U.S.C. § 411(a)(1). An individual union member may bring suit in District Court to enforce Title I rights,[5] after exhaustion of his internal union remedies,[6] only before the election has been conducted. Once the election has been held, Title IV is the exclusive

vehicle for challenging internal union elections. LMRDA § 403, 29 U.S.C. § 483.

Suits to remedy Title IV violations, however, may be brought only by the Secretary. In *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the Court held that a union member could not use Title I's jurisdictional grant to challenge in court a Title IV violation. The Court reasoned as follows:

"It is apparent that Congress decided to utilize the special knowledge and discretion of the Secretary of Labor in order best to serve the public interest. *Cf. San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 242 [79 S.Ct. 773, 778, 3 L.Ed.2d 775]. In so doing Congress, with one exception not here relevant, decided not to permit individuals to block or delay union elections by filing federal-court suits for violations of Title IV. Reliance on the discretion of the Secretary is in harmony with the general congressional policy to allow unions great latitude in resolving their own internal controversies, and, where that fails, to utilize the agencies of Government most familiar with union problems to aid in bringing about a settlement through discussion before resort to the courts."

379 U.S. at 140, 85 S.Ct. at 296 (footnote omitted).

Subsequently, in *Dunlap v. Bachowski,* 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), the Court held that the scope of judicial review of the Secretary's decision not to bring suit under Title IV was exceedingly narrow. 421 U.S. at 568–76, 95 S.Ct. at 1858. Both individual union members and the public, therefore, must rely upon the Secretary to utilize Title IV's post-election remedies in the appropriate case. *See generally Boltuch,* Enforcement Procedures for Union Elections, 28 *Ala.L.Rev.* 243, 247–50, 262–68 (1977).

Congress' general objectives in enacting Title IV were summarized concisely by Jus-

---

**3.** This total does not reflect the five union members who voted by absentee ballot.

**4.** There was one void ballot.

**5.** LMRDA § 102, 29 U.S.C. § 412.

**6.** LMRDA § 402(a)(1), 29 U.S.C. § 482(a)(1).

tice Brennan in *Local 3489, United Steel Workers of America v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977):

"The basic objective of Title IV of the LMRDA is to guarantee "free and democratic" union elections modeled on "political elections in this country" where "the assumption is that voters will exercise common sense and judgment in casting their ballots." 391 U.S., at 504 [88 S.Ct. at 1750]. Thus, Title IV is not designed merely to protect the right of a union member to run for a particular office in a particular election. "Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Wirtz v. Bottle Blowers Assn., supra,* at 475 [88 S.Ct. at 650]; *Wirtz v. Laborers' Union, supra,* at 483 [88 S.Ct. at 642]. The goal was to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership." *Wirtz v. Hotel Employees, supra,* at 497 [88 S.Ct. at 1746]."

429 U.S. at 309, 97 S.Ct. at 614.

It is apparent, therefore, that while the LMRDA does not give the federal courts a license to interfere unnecessarily in internal union affairs, *see, e. g., Wirtz v. Hotel Employees,* 391 U.S. 492, 496, 88 S.Ct. 1743, 1746, 20 L.Ed.2d 763 (1968); *Wirtz v. Bottle Blowers Association,* 389 U.S. 463, 473, 88 S.Ct. 643, 649, 19 L.Ed.2d 705 (1968), Title IV does contemplate that the Secretary will actively protect the public's interest in fair and democratic union elections. *See, e. g., Hodgson v. Local 6799, United Steel Workers of America,* 403 U.S. 333, 338–39, 91 S.Ct. 1841, 1845, 29 L.Ed.2d 510 (1971); *Brennan v. Local Union 122, Amalgamated Clothing Workers of America,* 564 F.2d 657, 660 (3rd Cir. 1977). *See also Trbovich v. United Mine Workers,* 404 U.S. 528, 532–33, 92 S.Ct. 630, 633, 30 L.Ed.2d 686 (1972). Moreover, in light of the Court's decision in *Harvey,* "the importance of the Secretary's [T]itle IV civil action in attaining union

democracy—apparent on the face of the statute and in the legislative history—is magnified." Beaird, Union Officer Election Provisions of the Labor-Management Reporting and Disclosure Act of 1959, 51 *Va.L. Rev.* 1306, 1325 (1965).

Professor Cox has termed the internal union election process "the heart of union democracy," requiring "a fair opportunity to nominate and vote for candidates." Cox, Internal Affairs of Labor Unions Under the Labor Relations Act of 1959, 58 *Mich.L.Rev.* 819, 842–43 (1960). While a union is not required to guard against every "undemocratic effect" of any given election procedure, *see, e. g., Hodgson v. Local Union 582,* 350 F.Supp. 16, 19 (C.D.Cal.1972), a union cannot shield itself against a denial of voting rights charge "simply by affording each member the 'mere naked right to cast a ballot' the right each member has to vote must be 'meaningful.'" *Bunz v. Moving Picture Machine Operators' Protective Union,* 567 F.2d 1117, 1121 (D.C.Cir.1977) (footnote omitted). *Accord, Marshall v. American Postal Workers Union,* 486 F.Supp. 79, 82–83 (D.D.C.1980); *Pawlak v. Greenwalt,* 464 F.Supp. 1265, 1272 (M.D.Pa.1979). *See generally* Summers, Judicial Regulation of Union Elections, 70 *Yale L.J.* 1221, 1223 (1961).

In Title IV, Congress established as part of our national labor policy the goal of free and democratic union elections. Congress left to the courts, however, the task of determining the "reasonableness" of a particular election procedure once it is challenged by the Secretary. *See* Berchem, Labor Democracy in America: The Impact of Titles I & IV of the Landrum-Griffin Act, 13 *Vill.L.Rev.* 1, 34–37 (1967). In the instant case, the Secretary has produced evidence tending to show that over ten percent of those union members who came to the polls with a demonstrated intention of voting did not vote because of the disorganized conditions at the polling place. There is also evidence supporting the inference that the acts or omissions of the union were responsible for these conditions. Contrary

to the union's contention, the Secretary is not required to show that the union's actions were taken in "bad faith" to establish a violation. The effect on the union members of inadequate planning and disorganized polling conditions is the same regardless of the incumbents' states of mind. Since over ten percent of the union's members who intended to vote were effectively disenfranchised, the court cannot say, as a matter of law, that such a number is too insubstantial to constitute a violation of section 401(e), 29 U.S.C. § 481(e). If such a violation is established at trial, and it "may have affected" the outcome of the election, the Secretary is entitled to the relief sought unless the union can show that the violation did not affect the election's outcome. *Wirtz v. Hotel Employees*, 391 U.S. at 505–09, 88 S.Ct. at 1751–53.

*Status of Delegates to District Lodge No. 12*

 Defendant contends that the Secretary is without jurisdiction over the elections for delegates to District Lodge No. 12 on the ground that they are not "officers" within the meaning of section 3(n), 29 U.S.C. § 402(n). That section of the LMRDA defines an "officer" as:

> "any constitutional officer, any person authorized to perform the functions of president, vice-president, secretary, treasurer, or other executive functions of a labor organization, and any member of its executive board or similar governing body."

In determining whether a particular union official is an "officer" within the meaning of the LMRDA, the functions performed by that individual are to be examined. *See, e. g., United States v. Ford*, 462 F.2d 199, 200–01 (7th Cir. 1972); *Wirtz v. National Maritime Union of America*, 399 F.2d 544, 552 (2d Cir. 1968).

According to defendant, the function of a delegate is as follows:

> "The delegates to the District Lodge function as representatives from our constituent local unions to the District. The delegates only constitutional function is

to participate in the meetings of the District Lodge and report back to their local unions. *The delegates create policy in a legislative-sense*, but do not administer or supervise the affairs of the District Lodge as its officers must do."

Supplementary Affidavit of Patrick O'Brian, Paper No. 37. (emphasis supplied).

In addition, the delegates elect the District Lodge's constitutional officers (Article V, By-Laws of District Lodge No. 12, Paper No. 35, Ex. B). The Lodge, as a body, has the authority to "endorse and recommend the institution of new Lodges and the discontinuance of any Lodge or Lodges within its jurisdiction, and, shall have general advisory powers over all organization work in the District." (Article IV, By-Laws of District Lodge No. 12, Paper No. 35, Ex. B).

Although the business representative has direct responsibility for managing and administering collective bargaining agreements, that person is required to submit reports of these activities to the delegates who, in turn, must approve the reports in order for the business representative to be authorized to perform collective bargaining activities. (Affidavit of Lawton Ewing, Paper No. 38, at ¶ 3). Moreover, the delegates must approve the expenditure of funds, and they have the power to investigate internal union disputes. Finally, the delegates have the power to approve, disapprove, or mandate changes in the administration of grievance and arbitration proceedings. (Affidavit of Lawton Ewing, Paper No. 38, at ¶¶ 4 & 5).

 In accordance with its statutory duty to administer Title IV of the LMRDA, §§ 401, 402, 29 U.S.C. §§ 481, 482, the Secretary has promulgated interpretative regulations concerning Title IV's election provisions. *See* 29 C.F.R. § 452.1 (1980). Although not binding on the courts, they are entitled to deference to the extent that they are consistent with the policies and purposes of the LMRDA. *Skidmore v. Swift & Co.*, 323 U.S. 134, 138–40, 65 S.Ct. 161, 163–64, 89 L.Ed. 124 (1944).

The Secretary has interpreted the "executive functions" clause of section 3(n) to bring "within the term 'officer' any person who in fact has executive or *policy-making authority or responsibility.*" 29 C.F.R. § 452.19 (1980) (emphasis supplied). In defining the nature of "executive functions," the Secretary has stated:

> "A member of any group, committee or board which is vested with *broad governing or policy-making authority* will be regarded as a member of an 'executive board or similar governing body.'" 29 C.F.R. § 425.20 (1980).

■ Under the Secretary's interpretive regulations the delegates to District Lodge No. 12 would be considered union "officers" because they are vested with, and in fact exercise, broad governing and policy-making authority. In light of the remedial purposes underlying the enactment of the LMRDA, *see generally* Note, Union Elections and the LMRDA; Thirteen Years of Use and Abuse, 81 *Yale L.J.* 409 (1972), the court finds the Secretary's interpretive regulations to be consistent with the LMRDA's goals.

Additionally, defendant has conceded that District Lodge No. 12 is an "intermediate body" that must select its officers in the manner prescribed by section 401(d) of the LMRDA. 29 U.S.C. § 481(d). That section of Title IV provides:

> "Officers of *intermediate bodies,* such as general committees, system boards, joint boards, or joint councils, shall be elected not less often than once every four years by secret ballot among the members in good standing or *by labor organization officers* representative of such members who have been elected by secret ballot."

(emphasis supplied).

The delegates to District Lodge No. 12 are elected by secret ballot and they, in turn, elect by secret ballot the constitutional officers of an intermediate labor body. The delegates themselves appear to be "labor organization officers" under section 401(d), and therefore, "officers" within the meaning of section 3(n). *See* 29 C.F.R. § 452.22 (1980).

Accordingly, the court holds that the position of delegate to District Lodge No. 12 is subject to the Secretary's enforcement powers under Title IV of the LMRDA.

For the reasons set out above, it is this 10th day of February, 1981, *ORDERED*:

Defendant's motion for summary judgment is DENIED.