Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor

v.

LOCAL 119, INTERNATIONAL UNION OF ELECTRICAL, RADIO & MACHINE WORKERS, AFL–CIO, CLC.

Civ. A. No. 82–1297.

United States District Court, E. D. Pennsylvania.

Sept. 20, 1982.

Order modified, see 548 F.Supp. 1004.

fications for union office holding by requiring candidates to attend at least one-third of regular union membership meetings for each of the preceding two years (meeting attendance rule), and requiring candidates for Chief Steward to be stewards at the time of their nomination and election (current office holder rule). As a result of his failure to satisfy the meeting attendance rule, Local member Albert Lacy (Lacy) was ineligible for the position of Sectional Board Member representing Section 7. Failing to meet the current office holder rule, Local member Kenneth Kelley (Kelley) was ineligible for the position of Chief Steward. The Secretary now seeks to void the election of October 7, 1981, by which Local members selected certain officers, including those positions for which Lacy and Kelley were ineligible. A "Stipulation of Facts and Documents" was submitted to the court following the testimony presented at trial. For the reasons which follow, we find in favor of the Secretary with regard to both the meeting attendance rule and the current office holder rule, and order that a new election for the positions of Sectional Board Member representing Section 7, and Chief Steward, be held within 120 days.

Edward T. Ellis, Dept. of Labor, Dawn M. MacPhee, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Stephen J. Springer, R. Michael Carr, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

This is an action by the Secretary of Labor (Secretary) against Local 119, International Union of Electrical, Radio & Machine Workers, AFL–CIO, CLC (Local), pursuant to § 402(b) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 482(b) (Act or LMRDA), alleging violation of § 401(e) of the Act, 29 U.S.C. § 481(e). The Secretary contends that the Local imposed unreasonable quali-

### I.

Local 119 is the recognized collective bargaining representative of the employees of General Electric Company at two plants in Philadelphia, Pennsylvania, one plant in Collingdale, Pennsylvania, and one plant in Pennsauken, New Jersey. The Local is governed by the Constitution of the International Union of Electrical Workers and by the Local's Constitution and By-Laws. Pursuant to the Local's Constitution, election of officers, including President, Vice-President, Financial-Secretary, Secretary-Treasurer, Trustees, Sergeant-at-Arms, Chief Stewards, and Sectional Board Members is held the first Wednesday of October of every odd-numbered year. It is the election of October 7, 1981 that is at issue in this case. Every December, the members of the Local elect Stewards.

Article VIII(2), Section A of the Local's Constitution and By-Laws requires that "[a]ny member seeking office must have attended at least one-third (⅓) of the regular membership meetings in each year of the two (2) years next preceding the September Sunday meeting." Regular membership meetings are held the second Sunday of each month, except for the May meeting, which is held the third Sunday, beginning at 2 P.M. During the meetings general union business, including the status of grievances and financial matters, is discussed.

The Local's Constitution and By-Laws provide that "illness of a member may be counted as an excuse for not attending the required number of meetings..." (Article VIII(2) Section A), and that a member serving in the military or governmental voluntary agency such as the Peace Corps will be considered as having met the meeting attendance rule (Article VIII(2) Section H).

At the September 13, 1981 meeting, Alberty Lacy nominated himself for the position of Sectional Board Member. The duties of Sectional Board Member include the handling of grievances and sitting on the Executive Board, which makes decisions between membership meetings when necessary. Lacy sought office as an independent, and was not affiliated with any party or slate.

Because he had not attended at least four meetings in each of the two preceding years, the Local's Election Board, which is elected at a membership meeting to supervise an upcoming election, found Lacy ineligible for office. Lacy had attended a sufficient number of meetings to be eligible for office in 1975, 1977 and 1979, and because he wanted to find out about procedures for running for union office had obtained and

read a copy of the Local Constitution and By-Laws in March 1979. In 1980 Lacy attended no meetings, nor made any attempt to do so. He was laid off the entire year, and was not unable to attend any meetings because he had to work.

On October 8, 1981, Lacy filed an objection to the 1981 election with the Local's Recording Secretary. Neither the Local nor the International Union of Electrical Workers ruled on Lacy's objections and on or about January 17, 1982, Lacy filed a complaint with the Department of Labor, pursuant to § 402(a)(2) of the Act, 29 U.S.C. § 482(a)(2), which provides for such action.[1]

Article VIII(2), Section E of the Local's Constitution and By-Laws states that "[a] Chief Steward, in order to be eligible for nomination, must be a Steward at the time of nomination and election." At the September 13, 1981 membership meeting, Kenneth Kelley was nominated for the office of Chief Steward, factory night shift. In the summer of 1981 Kelley accepted a transfer to a higher paying position in a different section at the same plant. Kelley understood that in accordance with the Local's policy, he would be required to step down from the positions of Steward and Sectional Board Member for Section 2, which he then held. Because he was not a steward at the time of his nomination for Chief Steward, Kelley was found ineligible for that position by the Local's Election Board.

Kelley was affiliated with the party slate of the incumbent President of the Local. The election for Chief Steward was won by a candidate opposing that slate.

On or about October 12, 1981 the Local's Recording Secretary received Kelley's ob-

1.  Section 402(a) provides as follows:

    (a) A member of a labor organization—
    (1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
    (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation, may file a complaint with the Secretary within one calendar month thereafter alleging the violation of

any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

jection to the election. Neither the Local nor International Union ruled on that objection, and Kelley filed a complaint with the Department of Labor on or about January 26, 1982, as provided for in § 402(a)(2) of the Act.

Membership in the Local has decreased from 4509 in August, 1973 to 1142 in August, 1982. Local 119's membership during the 1981 election was 1446, as compared to 1811 in 1979 and 2150 in 1977. The number of members eligible to run for office during the 1981 election was 83, as compared to 102 in 1979 and 119 in 1977.

Because of the substantial reduction in the work force at General Electric in the period since October, 1981, the total disbursements of Local 119 have exceeded the total cash receipts by $13,336.71. Due to the lay-offs of Local members, the cash assets of the Local have been depleted from $94,313.99 in January, 1978 to $63,564.02 in May, 1982. Local 119 owns real property, used to conduct its business, with a July 31, 1981 value of $46,344.00.

In response to these financial difficulties, the present leadership of the Local has instituted a comprehensive plan to cut the costs of administration, including reducing the number of officers, ceasing payment of expense money to officers, and planning to close the union hall during the winter. The number of Chief Stewards has been reduced from six to three, and the number of stewards is now 42, down from 92 in 1975 and 52 in September, 1981.

As stipulated by the parties the estimated cost of rerunning the entire election of all Local 119 offices is $5,000.00 or $6,000.00.

In accordance with § 402(b) of the Act, 29 U.S.C. § 482(b) [2] which provides for actions such as this, the Secretary alleges that

Section 401(e) of the Act, 29 U.S.C. § 481(e), has been violated in that an unreasonable meeting attendance requirement imposed by the Local has deprived members in good standing of their right to be candidates in the October 7, 1981 election of officers, and members in good standing were denied the right to be candidates due to the imposition of an office holding requirement.

Section 401(e) of the Act provides in pertinent part that:

"In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to ... reasonable qualifications uniformly imposed)...."

Pursuant to Section 402(c),

"If, upon a preponderance of the evidence after a trial upon the merits, the court finds—

. . . . .

(2) that the violation of section 481 of this title may have affected the outcome of an election,

The court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization."

Further, as provided in Section 402(b), "[t]he court shall have power to take such action as it deems proper to preserve the assets of the labor organization."

Before considering the exercise of the court's remedial power, we must look first

---

**2.** Section 402(b) provides as follows:

(b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accordance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.

at the Local's compliance with the eligibility mandate of Section 401(e), and determine whether the meeting attendance rule or the current office holding rule constitute something other than "reasonable qualifications uniformly imposed."

## II.

We begin with the following observations of the Supreme Court:

The LMRDA does not render unions powerless to restrict candidacies for union office. The injunction in § 401(e) that "every member in good standing shall be eligible to be a candidate and to hold office" is made expressly "subject to ... reasonable qualifications uniformly imposed." But "Congress plainly did not intend that the authorization ... of 'reasonable qualifications ...' should be given a broad reach. The contrary is implicit in the legislative history of the section and in its wording ...." ... The basic objective of Title IV of the LMRDA is to guarantee "free and democratic" union elections modeled on "political elections in this country" where "the assumption is that voters will exercise common sense and judgment in casting their ballots." ... Thus, Title IV is not designed merely to protect the right of a union member to run for a particular office in a particular election. "Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." ... The goal was to "protect the right of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government and, through the election process, to keep the union leadership responsive to the membership." ...
Whether a particular qualification is "reasonable" within the meaning of § 401(e) must therefore "be measured in terms of its consistency with the Act's command to unions to conduct 'free and democratic' union elections." ... Congress was not concerned only with corrupt union leadership. Congress chose the goal of "free and democratic" union elections as a preventive measure "to curb the possibility of abuse by benevolent as well as malevolent entrenched leadership." ... [Wirtz v.] Hotel Employees [391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968)] expressly held that that check was seriously impaired by candidacy qualifications which substantially deplete the ranks of those who might run in opposition to incumbents, and therefore held invalid the candidacy limitation there involved that restricted candidacies for certain positions to members who had previously held union office.... (citations omitted)

*Steelworkers v. Usery,* 429 U.S. 305, 308–310, 97 S.Ct. 611, 614–615, 50 L.Ed.2d 502 (1977), quoting *Wirtz v. Hotel Employees,* 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763; *Wirtz v. Bottle Blowers Assn.,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705; *Wirtz v. Laborers' Union,* 389 U.S. 477, 88 S.Ct. 639, 19 L.Ed.2d 716.

Applying those principles, the court in the *Steelworkers* case found a meeting attendance rule similar to the one in the case *sub judice* to be in violation of section 401(e). The provision at issue in that case limited eligibility for local union office to members who had attended at least one-half of the regular meetings of the local for three years previous to the election. Regular meetings were held on a monthly basis, so that in order to attend half of the meetings in a three year period, a previously inactive member desiring to run for office would have to begin attending 18 months before the election.

The Supreme Court held that the rule had a restrictive effect on union democracy, reasoning that opposition to incumbent leadership was likely to emerge in response to particular issues at different times, with member interest in changing union leadership therefore likely to be at its highest only shortly before elections. *Id.,* 429 U.S. at 311, 97 S.Ct. at 615. Thus the court deemed it probable that to require a member to decide upon a potential candidacy at

least 18 months in advance of an election might discourage rather than foster candidacies and to that extent impair the general membership's freedom to oust incumbents in favor of new leadership. *Id.* The court emphasized that Congress chose to guarantee union democracy by regulating not the results of a union's electoral procedure but the procedure itself. *Id.* at 311–312, 97 S.Ct. at 615–616.

The court then went on to reject the union's argument that the rule was reasonable because it encouraged attendance at union meetings and assured more qualified officers by limiting election to those with demonstrated interest in union affairs and familiar with union problems. The court observed that the rule had in fact done little to encourage attendance at meetings as only a handful of members were so attracted. *Id.* at 312, 97 S.Ct. at 616. Furthermore, limiting the possibility of dissident candidates runs directly counter to the premise of the statute that the best means of attracting knowledgeable and dedicated leaders was to leave the choice of leaders to the membership in open democratic elections, unfettered by arbitrary exclusions. *Id.*

█ We find the meeting attendance rule now challenged by the Secretary to be so similar to the rule invalidated in *Steelworkers* that it too is in violation of the Act. The Supreme Court in large part based its decision on the length of time prior to an election that a prospective candidate for union office would be required to decide upon a candidacy. In the case *sub judice* that period of time is 16 months, as compared to 18 months in *Steelworkers,* a difference of little significance in view of the factors enumerated by the Supreme Court in order to determine reasonableness. If 18 months is a period so far in advance of an election as to be likely to discourage candidacies and stifle union democracy, surely a 16 month period, a mere two month difference, will have the same effect.

Absent any reason to believe that the meeting attendance rule now before this court has an impact upon Local 119 elec-

tions different than that of the rule in *Steelworkers,* we must conclude that it too violates § 401(e). Such a conclusion is inescapable, for the percentage of ineligible members during the 1981 election was 94.26%. The percentage in 1979 was 94.36% and 94.46% in 1977. Obviously the rule has done no more to encourage attendance than did the rule in *Steelworkers.* In addition, these figures are remarkably similar to the percentage, 93%, of ineligible members considered too high for an election qualification to be reasonable in *Wirtz v. Hotel Employees,* 391 U.S. at 502, 88 S.Ct. at 1749.

Moreover, the folly of such a meeting attendance requirement is easily seen in this case, in which it operated to bar a candidate whose interest in union affairs was longstanding and who had in fact been eligible, even under the rule, for office in previous election years.

### III.

█ We turn now to the office holding rule, and note initially that contrary to the Secretary's characterization, it is a *current, not prior* office holding requirement. Indeed, Kelley was a prior steward; his ineligibility under the rule was due to his not currently being a steward at the time of the nomination and election. That distinction, however, has little bearing on validity of the rule under the statute. A union regulation that limited eligibility for election to certain positions to those who had held certain other union offices, was held to be in violation of § 401(e) in the *Hotel Employees* case. The Supreme Court was not persuaded by the argument that candidacy for offices of greater responsibility be conditioned upon a holding of a position from which a member could acquire experience and training. Such an argument was thought to assume that members were unable to distinguish qualified from unqualified candidates without a demonstration of performance in other offices. Yet that assumption was contrary to the model of democratic elections established by Congress. *Id.* at 504, 88 S.Ct. at 1750. The court concluded that given the Act's objec-

tive, "a candidacy limitation which renders 93% of union members ineligible for office can hardly be a 'reasonable qualification.'" *Id.* at 502, 88 S.Ct. at 1749.

The reasoning of the court is equally applicable with regard to the office holding rule in the case *sub judice.* Assessment of the qualifications of candidates for Chief Steward is best left to the general membership voting in the election, for such is the model of union democracy envisaged by Congress. As the Supreme Court has stated, Congress' main concern was with the *procedure* of union elections and their adherence to the principles of democracy. Thus, the reasonableness of qualifications for office depends to a great degree on the extent to which members are not prevented from running for office and the extent to which the membership can make a free electoral decision. If a rule requiring prior office holding is unduly restrictive, surely a rule requiring current office holding is even more restrictive, for it further limits the number of eligible candidates.

As in *Hotel Employees,* here too the overwhelming majority of Local members are precluded from election to a particular office because of their failure to hold a different union office, for only the 52 members holding the office of Steward were eligible to run for Chief Steward. Thus 96.4% were ineligible.

### IV.

■ Having determined that both of the rules at issue here violate § 401(e), we consider next whether the violation "may have affected" the outcome of the election. As recognized in *Wirtz v. Hotel Employees,* 391 U.S. at 506–08, 88 S.Ct. at 1751–1752, a proved violation of § 401 establishes a rebuttable prima facie case that the violation may have affected the outcome. The Supreme Court found that the prima facie case established by the violation was not met by evidence showing that the result was not affected. The court held that there was no tangible evidence against the reasonable possibility that the wholesale exclusion of members did not affect the outcome. Neither the substantial defeat of candidates of the same party as those disqualified nor the lack of evidence that the disqualified nominees were proven vote-getters were considerations which constituted proof that the election result was not affected. *Id.* at 508, 88 S.Ct. at 1752.

As in *Hotel Employees,* any suggestion here that the results of an election in which nominees were disqualified were not affected is but pure conjecture. Merely because Lacy was not affiliated with any party or slate but sought office as an independent does not mean that the election outcome was not affected by his ineligibility. Similarly, just because the election for Chief Steward was won by the candidate of a slate opposed to the slate with which Kelley was affiliated does not show that the outcome was not affected by Kelley's ineligibility. Indeed, Kelley's proven vote-getting ability is demonstrated by his election to the positions from which he had to resign when he was transferred. Of course, we cannot know for sure how the elections for Sectional Board Member and Chief Steward might have been affected by the rules challenged by the Secretary, but there is no evidentiary support for a finding that the prima facie showing that they were affected has been successfully rebutted.

Accordingly, since the § 401 violation may have affected the outcome of the elections for Sectional Board Member representing Section 7, and for Chief Steward, pursuant to § 402(c) of the Act this court declares the 1981 election for those two positions void. We therefore order a new election for those offices, to be conducted under the Secretary's supervision, within 120 days. We take this action with full awareness of the financial situation of the Local, but as we shall explain, we do not believe that the Local need be put to any large additional expense as a result of our decision.

### V.

■ Several Courts of Appeals have recognized that a suit under Section 402 of the Act seeking to set aside a union election is

governed by equitable principles and subject to the flexibility and practicality that characterizes equity jurisprudence. *Marshall v. Local 1010, United Steelworkers of America,* 664 F.2d 144, 149 (7th Cir. 1981); *Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d 946 (2nd Cir. 1976); *Kupau v. Yamamoto,* 622 F.2d 449 (9th Cir. 1980). Furthermore, as provided in § 402(b), the court may take such action as is proper to preserve the assets of the Local, and at least one court has expressed its concern with the possibility of unnecessary expense to union members due to a new election. *Usery v. International Organization of Masters, Mates and Pilots,* 538 F.2d at 951.

In the case *sub judice,* the Local urges us to apply equitable principles, and after taking into account the expense of a new election to a union already in financial difficulty, refrain from ordering a new election supervised by the Secretary. We have seriously considered this argument, and had we been convinced that the Local would indeed be forced to hold a separate special election at a cost of five or six thousand dollars, we would have hesitated before ordering such a new election. However, the Local has available to it a means to avoid such expense, for every December, the members elect Stewards. By scheduling the new election for Chief Steward and Section Board Member in conjunction with and to be held concurrently with the regularly scheduled election for Stewards, much of the cost of holding a separate new election would surely be saved. As always, the December election would of course be held anyway, and the cost of such a regular election borne by the Local despite its current financial condition. Thus, though additional cost will no doubt be involved, even with such a procedure, the Local will itself thereby be able to preserve its own assets, while complying with the law enacted by Congress. However, we do not require that the new supervised election be held concurrently with the regular December election, in order to permit the Local to retain sufficient flexibility to conduct its affairs free from unnecessary governmental interference, as was the intent of Congress. In any event, a new election, supervised by the Secretary, for the positions of Chief Steward and Sectional Board Member representing Section 7, shall be held within 120 days.

### ORDER

Judgment is entered in favor of the plaintiff and against the defendant. In accordance with the attached Opinion, a new election, supervised by the Secretary of Labor, for the offices of Chief Steward and Sectional Board Member for Section 7, is to be held within 120 days of the date of this Order.

IT IS SO ORDERED.