Raymond J. **DONOVAN**, Secretary of Labor, United States Department of Labor, Plaintiff,

**and**

**Helen Carter, Plaintiff Intervenor,**

**v.**

**CSEA LOCAL UNION 1000, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, Defendant.**

No. 83–CV–108.

United States District Court, N.D. New York.

July 19, 1984.

Jay S. Berke, Regional Sol., U.S. Dept. of Labor, New York City, for plaintiff; William M. Gonzalez, U.S. Dept. of Labor, New York City, of counsel.

Hall, Clifton & Schwartz, New York City, for plaintiff-intervenor; Daniel Clifton, New York City, of counsel.

Roemer & Featherstonhaugh, P.C., Albany, N.Y., for defendant; Michael J. Smith, Albany, N.Y., of counsel.

#### ORDER

MINER, District Judge.

#### I

The present motion by the Secretary for partial summary judgment, Fed.R.Civ.P. 56(a), is addressed to that aspect of the

Secretary's complaint which charges that defendant CSEA's June 15, 1982 mail ballot election violated § 401(e) of the Labor-Management Reporting and Disclosure Act ("LMRDA") by imposing unreasonable candidacy requirements and thereby denying union members the right to be candidates. The heart of the challenge is not to the election itself but rather to the nominating procedures. On June 29, 1984, this Court granted the Secretary's motion for partial summary judgment on his claim that the election violated the LMRDA's secret ballot provisions. A transcript of that decision is appended hereto and incorporated herein.

## II

Nominations for the CSEA election are governed by Article IV of the union's constitution. A statewide nominating committee, consisting of members selected by the executive board of each of six regions, is required by the constitution to select at least two nominees for the statewide positions of president, executive vice-president, secretary and treasurer. Nominees are selected from among those union members in good standing who have timely submitted a "Request to Be a Candidate" form. In 1982, the committee consisted of eighteen appointed members, and a plurality vote of the committee was required for a nominee to be placed on the ballot.

The constitution provides no written guidelines to committee members in their selection from among eligible nominees. Members are free to use their own judgment in casting their votes for a candidate. What qualifications are required for statewide office are not set forth in any written or oral instructions to members. The union's position in this litigation, however, is that the committee selects the best qualified candidates.

Nominations are also placed on the ballot automatically by the committee for those incumbent officers who choose to run again for office. All incumbents chose to be on the ballot in 1982 and were successful in retaining three of the four statewide officer positions. A union member who is rejected by the committee may seek to have his or her name placed on the ballot by independent petition. He or she then has a period of approximately six weeks from notice of the committee's rejection to obtain signatures of not less than two percent of the CSEA members, which in 1982 meant obtaining over 3,800 signatures in six weeks from members located throughout New York State.

Only one of the candidates on the 1982 ballot was placed there by official petition. Four candidates were incumbents who needed only to consent to be on the ballot, and only four candidates were nominated by the committee for the four positions, although the constitution requires at least two nominations for each position and places no bar to a greater number of nominees.

## III

Section 401(e) of the LMRDA, 29 U.S.C. § 481(e) provides, in pertinent part:

a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice ....

Whether a particular procedure is reasonable and capable of uniform application depends to a great extent on its consistency with the purposes of the Act. The main purpose of the Act, of course, is to prevent undemocratic practices in union governance. "Thus, any qualifications that unduly interfere with a free choice of candidates are at cross-purposes with [the Act] and are not 'reasonable.'" *Donovan v. Local Union No. 120, Laborers' International Union*, 683 F.2d 1095, 1102 (7th Cir.1982).

The Supreme Court has considered the reasonableness of a qualification for office under § 481(e) on two occasions. In [*Wirtz v. Hotel, Motel and Club Employees Union, Local 6*, 391 U.S. 492, 88

S.Ct. 1743, 20 L.Ed.2d 763 (1968)] the Court invalidated a union rule that restricted eligibility for major union offices to those who held, or who had previously held, some union elective office. The rule was found not to be a "reasonable qualification" because it rendered 93% of the union membership ineligible for higher office, thus making free and democratic elections impossible. Similarly, in [*Local 3489, United Steelworkers of America v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977)] the Court found a meeting attendance rule invalid because it excluded 96.5% of the union membership from office. The Court decided that the antidemocratic effects of the rule outweighed any benefits derived from it.

683 F.2d at 1102–03 (footnotes omitted).

The present case does not fall precisely within the holdings of either of those two cases. In *Wirtz v. Hotel, Motel and Club Employees*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763, however, the Court provided some general guidance when it noted that "Congress plainly did not intend that the authorization in § 401(e) of 'reasonable qualifications uniformly imposed' should be given a broad reach. The contrary is implicit in the legislative history of the section and in its wording ...." *Id.* at 499, 88 S.Ct. at 1748. The Court went on to conclude that in elections, "the assumption is that voters will exercise common sense and judgment in casting their ballots." *Id.* at 504, 88 S.Ct. at 1750.

In the instant case, ten CSEA members sought nomination for office by submitting "Request to be a Candidate" forms. The Secretary argues that although the committee was not limited by the union's constitution to a maximum number of candidates per office, it selected only two candidates for president, one each for executive vice-president and treasurer, and none for secretary. As a result, the Secretary concludes, the committee's procedures reduced the opposition to all incumbents who chose to re-run for these elected offices.

The Secretary concedes that unions have a legitimate interest in imposing minimum standards for candidacy and office-holding in the organization but urges that a balance must be struck with "the dominant purpose of the Act [which] is to ensure the right of members to participate fully in governing their union and to make its officers responsive to the members." 29 C.F.R. § 452.35.

Although the nomination procedures challenged here imposed no express qualification requirements, the thrust of the Secretary's attack is that the nominating committee substituted its judgment for that of individual union members. In particular, the Secretary argues that two committee members appeared to have weighed experience in prior CSEA office as a factor in determining qualification for candidacy. Although here not a formally articulated policy, this type of requirement is precisely the type struck down by the Supreme Court in *Wirtz v. Hotel, Motel and Club Employees*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763. *See also Wirtz v. National Maritime Union*, 399 F.2d 544, 550 (2d Cir.1968) ("It must be left to the judgment of each member to determine in particular instances how much weight to give to prior experience").

Even more importantly, the Secretary challenges the fact that the committee was acting in the absence of any valid criteria or guidelines, leaving each committee member with unbridled discretion to determine who would be candidates, thereby precluding any uniform imposition of requirements. The decision of the Seventh Circuit in *Donovan v. Local Union No. 120, Laborers' International Union*, 683 F.2d 1095 (7th Cir.1982), offers compelling support for the Secretary's position. Although that case dealt with a formal competency requirement embodied in the union's constitution, the reasoning of the court is equally persuasive here:

A second and related problem, also noted by the Secretary in 29 C.F.R. § 452.53 is the subjectivity inherent in the application of a vague and general

qualification. Without further definition, a judgment that a candidate is or is not "competent to perform the duties of the office" is almost totally subjective. Therefore, the decision to disqualify is largely discretionary, even arbitrary. The question of who judges the qualification becomes vital to its reasonableness under § 481(e). In the case at bar, the decisionmakers were three Judges of Election appointed by the incumbent Board. When so much discretion is placed in the hands of those chosen by the incumbents, the possibilities for abuse are clear, and free and democratic elections are threatened.

. . . . .

The vague and subjective nature of a competency qualification also brings it into conflict with the specific mandate of § 481(e) that reasonable qualifications be "uniformly imposed." In this case, the district court found "that the Judges of Election did not apply uniform guidelines in considering the competency of candidates appearing before them," and that neither the Local nor the Judges of Election "adopt[ed] any specific factors to be considered in determining the competency of a candidate under Article V, Section 3." Due to the significant role of personal judgment in determining "competency," it is unlikely that there can be uniform application of the provision. Unlike a qualification for office relating to the minimum age or the minimum length of union membership of the candidate, a competency provision cannot be applied with the precision and certainty necessary to ensure it is "uniformly imposed." A literacy requirement similar to that imposed by the Local's Constitution might be capable of uniform application if certain objective tests are administered to measure ability to read and write. A candidate's competency, on the other hand, cannot be readily determined by an objective test; a candidate's fitness for the office of union president, for example, cannot be readily determined by tests for leadership, loyalty and administrative ability. Though the office at issue in this case, that of Secretary-Treasurer, might make relevant some sort of objective test for record-keeping or accounting ability, there are no tests to evaluate the other, less tangible, qualities associated with "competency."

A final antidemocratic effect results because the competency provision prevents the membership from making just the sort of evaluation elections are intended to provide. It is certainly true, as the Local submits, that in the abstract competency is a most appropriate qualification for office. Congress intended to ensure competent office holders through the provisions of the Act. However, Congress intended that competent officers be provided through a system of free and democratic elections, not through a screening of candidates by a tribunal using a standard vague enough to allow it to veto any particular candidate.

As stated by the Court in *Hotel Employees*, 391 U.S. at 504, 88 S.Ct. at 1750, "Congress' model of democratic elections was political elections in this country . . . . [T]he assumption is that voters will exercise common sense and judgment in casting their ballots." The Local's system of having a tribunal pre-judge the competency of candidates for office does not correspond to the process of political elections. As stated by the Secretary: "In union elections as in political elections, the good judgment of the members in casting their votes should be the primary determinant of whether a candidate is qualified to hold office." 29 C.F.R. § 452.35 (1981).

We conclude that the requirement of competency, lacking an objective standard, permits arbitrary and subjective barring of candidates by the Judges of Election. By its nature it cannot be uniformly imposed, and it is likely to obstruct the democratic process intended by Congress. Accordingly, it does not qualify as a "reasonable qualification" for office under 29 U.S.C. § 481(e), capable of being "uniformly imposed."

683 F.2d at 1104–05. This holding appears to impel the conclusion that CSEA's nominating procedures similarly are violative of the Act.

Moreover, consistent with the holding in *Donovan v. Local 120,* the Secretary contends that CSEA's process further violates the Act because potential candidates are not put on notice as to the specific standards that will be employed by the committee in determining his or her candidacy. The *Local 120* court wrote:

[T]he requirement that a candidate be competent to perform the duties of the office he seeks is vague and does not provide the potential candidate with notice of the specific standards he must meet to get on the ballot. This problem is emphasized by the Secretary, to whom Congress has given a significant role in the administration of the Act. The Secretary has stated:

An essential element of reasonableness is adequate advance notice to the membership of the precise terms of the requirement.... Qualifications must be specific and objective. They must contain specific standards of eligibility by which any member can determine in advance whether or not he is qualified to be a candidate. For example, a constitutional provision which states that "a candidate shall not be eligible to run for office who intends to use his office as a cloak to effect purposes inimical to the scope and policies of the Union" would not be a reasonable qualification within the meaning of section 481(e) because it is so general as to preclude a candidate from ascertaining whether he is eligible and would permit determinations of eligibility based on subjective judgments. Further, such a requirement is by its nature not capable of being uniformly imposed as required by section 481(e).

29 C.F.R. § 452.53 (1981). A competency qualification suffers from the same deficiencies as the example set forth by the Secretary. The term "competent" is general and ambiguous, and when made a qualification for office does not allow a member to take steps to ensure that he will be eligible for the ballot. The qualification is antidemocratic to the extent it discourages potential candidates by its vagueness.

683 F.2d at 1103–04.

The Court harbors no doubts that, standing alone, the CSEA procedures discussed above are indeed antithetical to and therefore violative of the fundamental purposes of the Act. These procedures, however, do not stand alone; instead, they are supported by alternative nominating procedures, freely and reasonably available to those union members who aspire to elected office. While, concededly, the need to submit a petition reflecting two percent membership support (in this case, just over 3,800 names) presents more difficulty for a nomination-seeking union member than the simple expedient of submitting a "Request to be a Candidate" form to the nominating committee, that alternative cannot be found to provide less than a "reasonable opportunity." Any contention to the contrary is belied both by the factual record before the Court and by the interpretation given those words by relevant case law. There is nothing inherently unreasonable in requiring a prospective candidate to garner and demonstrate minimal membership support. Indeed, the precise manner of gathering such support necessarily is embodied in any candidate's campaign itself. Because any prospective candidate is free to have his or her name placed on the ballot simply by attracting minimal rank and file support, he or she is afforded reasonable opportunity to become a candidate.

Viewed as a "qualification" requirement, the petitioning route is at once both manifestly reasonable and consonant with the purposes of the Act. First, it assures that qualification is measured solely in terms of membership support; second, it is the democratic voice of the union electorate that determines just such qualification. Because "the reasonableness of qualifications for office depends to a great degree on the extent to which members are not prevented from running for office and the extent to

which the membership can make a free electoral decision," *Donovan v. Local 119, International Union of Electrical, Radio & Machine Workers,* 548 F.Supp. 997, 1003 (E.D.Pa.1982), *modified,* 548 F.Supp. 1004 (E.D.Pa.1982), the independent ballot inclusion device made available by CSEA satisfies the statutory requirements.

As a factual matter, the record makes clear that the petition requirement here provided more than reasonable opportunity for members to gain candidate status. Most significantly, the only member who opted for such a route was overwhelmingly successful in her endeavor. Indeed, she attributes her ultimate election victory directly to her petitioning efforts. The process was both inexpensive and informal, and was compatible with the electoral desires of anyone who aspired to union leadership.

The Court rejects the Secretary's characterization of the procedure as potentially stigmatizing, since the ballot itself does not in any way reflect how a candidate's name came to appear thereon. Moreover, since, as the Secretary contends, union members are completely unaware of the factors going into candidate nomination, there is no reason to believe that candidates lacking committee endorsement would be perceived as less qualified.

Because members desirous of candidacy had a reasonable opportunity to have their names placed on the ballot and because the general membership was thereby assured an opportunity to exercise their vote in a wholly democratic fashion, there is no merit to the Secretary's position and the nominating procedures cannot be said to violate the LMRDA.[1] In light of this disposition, and in accordance with this Court's previous determination of June 29, voiding the 1982 election, the only question remaining is that of remedy.

Under section 402(c) of the LMRDA, 29 U.S.C. § 482(c), the Secretary is to conduct a new election "so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." While the Secretary seeks a new election within ninety days, CSEA argues that as a matter of equity, it should be permitted to have the new election conducted in June of 1985 at its regularly scheduled time. The dilemma facing the Court is a distressing one. The great expense of conducting an immediate new election and then another in less than a year seems a high price to pay in a case where, as here, there was no evidence of fraud or bad faith, but rather only mistaken judgment. On the other hand, to allow the present elected officers to remain in office for another eleven months notwithstanding the taint imposed on their offices by the violative 1982 election would do a great disservice to the democratic principles that serve as the cornerstone of the LMRDA.

In support of its equitable argument, CSEA relies on the decision of the Second Circuit in *Usery v. International Organization of Masters, Mates, and Pilots,* 538 F.2d 946 (2d Cir.1976). While that decision expressed general equitable concerns, particularly over the union's incurring unnecessary expenses, the facts of that case are sufficiently distinguishable from those present here. First, the taint from the challenged election had been diminished somewhat by an unsupervised, though proper, intervening election. Second, at the time the Secretary was to conduct the election, certain electoral problems had not yet been resolved and an immediate election might have been itself subject to a later re-run.

Were the present regularly scheduled election less than eleven months away, the equities would lie more clearly in CSEA's favor. *See Donovan v. Local 10902, Communications Workers of America,* 650 F.2d 799, 802 (5th Cir.1981). While the Court would view it as impractical and un-

---

1. The Secretary also argues briefly that CSEA's method of automatically placing incumbents' names on the ballot constitutes a separate and additional violation of the Act. While there may be merit to this contention, the Court need not address it here since counsel for CSEA represented to the Court at oral argument that that procedure no longer will be employed.

wise to require two elections within the course of little more than one year, that appears to be the desired remedy as expressed by counsel for all parties during oral argument. Accordingly, the Secretary hereby is directed to conduct the re-run election within ninety days of the date of this Order, the new officers to hold office until what would have been the expiration of the 1982–1985 term. The next election will therefore be the next regularly scheduled triennial election to be held in June of 1985.

While the Court interferes with the normal functioning of intraunion affairs reluctantly, it does so in the sincere belief that such intervention is necessary to ensure the effectiveness of the LMRDA and the vitality of union democracy.

It is so Ordered.

## APPENDIX

THE COURT: I am prepared to rule with respect to both motions presently before me. First, with respect to defendant CSEA's motion for partial summary judgment.

Part of the instant action challenges the results of a mail ballot election, the results of which were announced at 6:00 p.m. on June 15, 1982. The complaint alleges that the election denied union members the right to be candidates by imposing unreasonable candidacy requirements and by failing to conduct the election by secret ballot in violation of 29 U.S.C. Section 481. In February of 1982, Helen Carter submitted her request to be a candidate. Her request was denied on March 1, because she was not a member in good standing since June 1 of 1981. On March 5, Carter protested that decision by letter to CSEA. That protest was denied. On April 30, Carter filed a second pre-election protest. That protest was denied as untimely, although it is unclear how it was untimely since CSEA's bylaws have no provision regarding pre-election protests.

On June 15, at 6:00 p.m., the results of the election were officially announced by issuance of a press release and mailing of telegrams to candidates. By letter dated June 22, received by CSEA on June 24, Carter filed a post-election protest concerning a number of alleged violations. On June 25, Carter had a telegram phoned to CSEA adding an additional protest regarding the nominating procedure. The confirmation of the oral telegram was received by CSEA on Monday, June 28th. CSEA, on July 14th rejected Carter's protest regarding nominating procedures as untimely not having been made within ten days of the alleged violations.

CSEA now moves for summary judgment on the issue of the nominating procedures arguing that Carter's failure to protest timely means that she had not exhausted internal union remedies and that both she and the secretary are therefore barred from maintaining this claim.

CSEA's bylaws provide that protests concerning the results of an election must be filed with the executive director of the association by certified mail, return receipt requested, within ten days of the official announcement of the results of the election. Because 29 U.S.C. Section 482(a) requires exhaustion of internal remedies prior to filing a complaint with the secretary, CSEA claims that suit on this issue is precluded.

I find CSEA's position to be without merit. First, it is arguable that Carter's protest was not timely received. Second, even if it wasn't, CSEA's hypertechnical construction of its bylaws is at odds with the purposes of the Labor-Management Reporting and Disclosure Act.

While the election results were officially announced on June 15th, making June 25th the last day on which to file protests, the announcement was not made until 6:00 p.m. and then only through a press release. The results appeared in the June 18th issue of "Public Sector," CSEA's official newspaper, which many members would not receive until later in the week, and indeed, Carter herself did not receive the paper and therefore the results until June 21st, or 22nd. By announcing at 6:00 CSEA shaved

a day off the ten-day requirement. At the very least, since 6:00 was after the close of business on the 15th, Carter should have had until after the close of business on the 25th; since that was a Friday, she had until Monday the 28th when CSEA received the written confirmation of her June 25th telegram. While the bylaws required certified mail, surely a telegram confirmation serves the same purpose and should therefore be a satisfactory substitute.

In *Hodgson versus Local 67999 of the United Steelworkers*, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), the Supreme Court stressed the importance of internal exhaustion of union procedures. The Court emphasized, however, that the analysis of the exhaustion problem "must reflect the needs of rank and file union members—those people the requirement is designed ultimately to serve." 403 U.S. at 340, 91 S.Ct. at 1846. "Courts should impose a heavy burden on the union" to show that it did not have adequate notice, and "members should not be held to procedural niceties while seeking redress within their union." Page 431, Note 6. Here, not only did Carter notify the union with her pre-election protest, but also with her oral protest on June 25th. It is clear that CSEA's policy of notifying members of the official results was not designed to facilitate member protests but rather to impede them. *See Hodgson against Liquor Salesmen's Union, Local 2*, 444 F.2d 1344, 1349 (2d Circuit 1971): "Such procedural perversion of the exhaustion requirements of Section 402(a) will not be permitted." Under 29 U.S.C., Section 482(a), internal union procedures, including time limitations, must be flexibly applied. *Donovan against Local 1235, International Longshoreman's Association*, 715 F.2d 70, 74 (3d Circuit 1983).

At Page 76 of the Donovan against Local 1235, Third Circuit case:

"Members of a union, however well informed of its procedure for appeal, deal not with an outside agency whose interests are hostile to theirs but with their own union which should seek to reach a disposition of their grievances on the merits rather than on procedural technicalities. Union officials must be discouraged from adopting with their own members the same adversarial role which they may more appropriately play when acting on behalf of those members in negotiations with their employer."

Because the procedural default here was, if anything, entirely insignificant, I find that there was sufficient compliance to indicate exhaustion. Accordingly, CSEA's motion must be denied.

A more troublesome question is presented by the secretary's motion for summary judgment with respect to the secret ballot requirements, largely because a violation, if proved, precipitates a most drastic remedy, in the form of an order that the election be rerun under the supervision of the secretary.

The mail election challenged here was conducted by providing CSEA members with perforated ballot forms. The top portion contained voters' names and social security numbers and they were required to sign it for verification purposes. The bottom portion was the actual ballot. The forms were then mailed to the Independent Election Corporation of America. Voters were informed that their signature was required for validation purposes only and would be removed before counting, but that ballots without signatures would not be counted. In all, 197,000 ballots were mailed out; 51,000 were returned to IECA; 5600 were not counted because of the absence of voter signatures. There is no dispute that IECA maintained secrecy in its processing of ballots. However, the secretary urges that the secrecy requirement of 29 U.S.C. Section 481(b) was violated both because ballots did not contain names when they went to IECA and because Gregory Szurnicki, chairman of CSEA's election procedures committee reviewed approximately 30 ballots with names for purposes of validation.

Section 481 of the LMRDA provides that every local labor organization shall elect its officers not less often than once every

three years by secret ballot among the members in good standing.

Section 402(k) provides " 'secret ballot' means the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed."

There is no question that a secret ballot is mandatory.

CSEA argues but provides no authority, that it does not matter that IECA saw voter names, since the concern of the statute is that union members and officials, not third parties, not be able to associate voters with their vote.

It is clear, however, that CSEA violated the secrecy provision, since voters were capable of being identified with their ballots. The potential chilling effect is at the heart of the Act since voters are doubtless reluctant to have their votes attributed to them. Certainly, this somewhat explains why 5600 voters neglected to add their names, and perhaps why some members chose to not vote at all.

The instructions accompanying the ballot did not fully cure the problem since voters could not be certain who would see their ballots. All they were told was that their votes were confidential and that ballots would be tabulated by IECA. There could be no assurance to the reticent member that his vote would truly remain anonymous. Two cases in this area manifest an overwhelming preference for absolute secrecy. *Marshall against Local 12447, United Steelworkers,* 591 F.2d 199, 203 (3d Circuit 1978):

"The definition is phrased in mandatory terms: The ballots must be marked in such a manner that the voter cannot be identified with his choice. It is clear that in this election some voters could have been identified with their choices. It is also clear that the union did not take the steps which would have made certain that voters could not be identified with their preferences."

In a footnote of that opinion it indicates how strictly the secrecy requirement is to be construed:

"The evidence showed only that, because of the way the election was conducted, it was possible to observe how some voters had marked their ballots. This, we believe, was sufficient to show a violation of the Act where reasonable steps have not been taken to require members to vote in secrecy."

In mail-ballot elections, the secretary's regulations, codified at 29 C.F.R. 452.97(a), suggest a proper method for insuring secrecy, a method not employed here:

"The ballot must not contain any markings which upon examination would enable one to identify it with the voter. Balloting by mail presents special problems in assuring secrecy. Although no particular method of asserting such secrecy is presented, secrecy may be assured by the use of a double envelope system for return of the voted ballots with the necessary voter identification appearing only on the outer envelope."

In *Bachowski versus Brennan,* 413 F.Supp. 147, 150 (W.D.Pa.1976), appeal dismissed, 545 F.2d 363 (3d Circuit 1976), the Court noted:

"The requirement of secrecy would seem to include not only the right to vote in secret but also the right to secrecy after the ballots are cast. Any post-voting device by which it can be determined how a particular voter voted would be a violation of secrecy (such as signatures or other identifying marks on the ballot, or extracting each ballot from the ballot box and examining it immediately after it has been cast).

"By imposing the requirement of secrecy Congress meant to eliminate any form of potential coercion or intimidation which might occur if it could be learned in any manner how an individual voter had voted.

"Any violation of the right to secrecy either at the time of voting or by subsequent procedures of handling the ballots

constitutes a substantive and material infringement of the voter's rights, and also of the candidates' rights to a fair and honest competition for the suffrages of the union members.

"As plaintiff's counsel points out, 'Secrecy and safeguards are for the benefit of the challenger and the absence of secrecy and safeguards can only benefit the incumbent who controls the machinery of the union and can affect votes through fear or hope of favor.'"

The problem here is even more acute since a member of the union's election committee actually reviewed some ballots with voters' names suggesting that voter fears of anonymity may not have been unrealistic. It is clear then that the ballots were not secret.

The question that remains is one of remedy. Section 482(c) directs the Court, if it finds that a violation has occurred which may have affected the outcome of the election, to void the election and order a new one under the secretary's supervision. In *Wirtz against Hotel, Motel and Club Employees' Union,* 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968), the Supreme Court established that once a violation was established, a prima facie case had been made out that the violation "may have affected" the outcome. Evidence rebutting such a finding may not rest on conjecture but only on "tangible evidence against the reasonable probability that the violation did affect the outcome." 391 U.S. at 508, 88 S.Ct. at 1752.

The burden is thus substantial. In this type of case, "There is no conceivable way in which defendant can confront and overcome the imponderables inherent in analyzing the decisions made by each elector ... in choosing to vote or not to vote and in selecting the particular candidate for whom to vote ...."

*Usery against International Organization of Masters, Mates and Pilots,* 422 F.Supp. 1221, 1226–27 (S.D.N.Y.1976). Here, 5600 votes were not counted and 150,000 members did not even vote. The only effort made by CSEA to show no

affect is to point to margins of victory. For example, the president won by a vote of 25,785 to 11,675; executive vice-president 22,928 to 20,017, and treasurer, 22,173 to 13,144. Those figures, however, are meaningless since it remains to be seen whether secret ballots would have encouraged the 5600 non-signing voters to cast meaningful ballots, but the nonvoting members as well. CSEA also argues that no one other than Carter complained, but that too is irrelevant. It is also irrelevant that CSEA had a good election history. In short, CSEA has come forward with no evidence that the lack of secrecy did not affect the election.

Accordingly, a new election is required. It is no defense that such relief is unfair or unreasonable, since upon a violation a new election is mandatory under the statute.

While the remedy doubtless is a severe one, that is the price to be paid for vindicating the important congressional goal of ensuring union democracy.

Two weeks from today, a motion is returnable by the secretary as I understand it, relating to the nominating procedures. Although I have announced my determination with these motions in the record, the final order shall await the determination on that motion unless the parties advise me otherwise.

(Whereupon proceedings in the above-entitled matter were concluded.)

### CERTIFICATION

I, HIRAM F. SHEFFER, Official Court Reporter for the United States District Court, in and for the Northern District of New York, do certify this to be a true and accurate transcript of the stenographic record of the foregoing taken at the time and place noted in the heading hereof.

/s/ _____

HIRAM F. SHEFFER
Official Court Reporter
United States District Court
Northern District of New York