LOCAL 3489, UNITED STEELWORKERS OF AMERICA, AFL–CIO, ET AL. *v.* USERY, SECRETARY OF LABOR

No. 75–657. Argued November 30, 1976—Decided January 12, 1977

*Carl B. Frankel* argued the cause for petitioners. With him on the briefs were *Alfred E. Lawson, George H. Cohen, Michael H. Gottesman,* and *Bernard Kleiman.*

*John P. Rupp* argued the cause for respondent. On the brief were *Solicitor General Bork, Assistant Attorney General Lee, William F. Sheehan III, Leonard Schaitman, Eloise E. Davies, William J. Kilberg, Beate Bloch,* and *Marshall A. Deutsch.**

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Secretary of Labor brought this action in the District Court for the Southern District of Indiana under § 402 (b) of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 73 Stat. 534, 29 U. S. C. § 482 (b), to invalidate the 1970 election of officers of Local 3489, United Steelworkers of America. The Secretary alleged that a provision of the Steelworkers' International constitution, binding on the Local, that limits eligibility for local union office to members who have attended at least one-half of the regular meetings of the Local for three years previous to the election (unless pre-

*J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

vented by union activities or working hours),[1] violated § 401 (e) of the LMRDA, 29 U. S. C. § 481 (e).[2] The District Court dismissed the complaint, finding no violation of the Act. The Court of Appeals for the Seventh Circuit reversed. 520 F. 2d 516 (1975). We granted certiorari to resolve a conflict among Circuits over whether the Steelworkers' constitutional provision violates § 401 (e).[3] 424 U. S. 907 (1976). We affirm.

## I

At the time of the challenged election, there were approximately 660 members in good standing of Local 3489. The Court of Appeals found that 96.5% of these members were ineligible to hold office, because of failure to satisfy the meeting-attendance rule.[4] Of the 23 eligible members, nine were

---

[1] Constitution of International Union, United Steelworkers of America, Art. VII, § 9 (c) (1968).

[2] This section provides, in pertinent part:

"(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. . . . The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title."

[3] The Steelworkers' attendance requirement was held not to violate § 401 (e) in *Brennan* v. *Steelworkers*, 489 F. 2d 884 (CA6 1973). Similar meeting-attendance requirements of other unions were found unreasonable in *Usery* v. *Transit Union*, 545 F. 2d 1300 (CA1 1976); *Brennan* v. *Teamsters*, 161 U. S. App. D. C. 173, 494 F. 2d 1092, 1099–1100 (1974); *Wirtz* v. *Bottle Blowers Assn.*, 405 F. 2d 176 (CA3 1968).

[4] Petitioners challenge this figure in this Court, but we cannot find it clearly erroneous. It is stipulated that of the approximately 660 members of the local, only 22 had attended enough meetings to qualify, and one additional member was found eligible by adding his excused

incumbent union officers. The Secretary argues, and the Court of Appeals held, that the failure of 96.5% of the local members to satisfy the meeting-attendance requirement, and the rule's effect of requiring potential insurgent candidates to plan their candidacies as early as 18 months in advance of the election when the reasons for their opposition might not have yet emerged,[5] established that the requirement has a substantial antidemocratic effect on local union elections. Petitioners argue that the rule is reasonable because it serves valid union purposes, imposes no very burdensome obligation on the members, and has not proved to be a device that entrenches a particular clique of incumbent officers in the local.

## II

The opinions in three cases decided in 1968 have identified the considerations pertinent to the determination whether the attendance rule violates § 401 (e). *Wirtz* v. *Hotel Employees*, 391 U. S. 492; *Wirtz* v. *Bottle Blowers Assn.*, 389 U. S. 463; *Wirtz* v. *Laborers' Union*, 389 U. S. 477.

The LMRDA does not render unions powerless to restrict candidacies for union office. The injunction in § 401 (e)

---

absences to the meetings he attended. Petitioners now contend that other members may also have been eligible because of excused absences. In view of the admitted facts that the average attendance at meetings was only 47, and that the meetings were held in split day and evening sessions so that workers on any shift could attend, it seems unlikely that a significant number of workers could qualify by this method. In any event, petitioners introduced no evidence to suggest that members other than the above 23 were eligible, and the District Court, in its unpublished opinion, apparently accepted the Secretary's assertion that "in excess of 90%" of the local's membership was disqualified. In these circumstances, we cannot speculate that the findings of the courts below may have been materially inaccurate.

[5] Regular meetings were held on a monthly basis. Thus, in order to attend half of the meetings in a three-year period, a previously inactive member desiring to run for office would have to begin attending 18 months before the election.

that "every member in good standing shall be eligible to be a candidate and to hold office" is made expressly "subject to . . . reasonable qualifications uniformly imposed." But "Congress plainly did not intend that the authorization . . . of 'reasonable qualifications . . .' should be given a broad reach. The contrary is implicit in the legislative history of the section and in its wording . . . ." *Wirtz* v. *Hotel Employees, supra,* at 499. The basic objective of Title IV of the LMRDA is to guarantee "free and democratic" union elections modeled on "political elections in this country" where "the assumption is that voters will exercise common sense and judgment in casting their ballots." 391 U. S., at 504. Thus, Title IV is not designed merely to protect the right of a union member to run for a particular office in a particular election. "Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." *Wirtz* v. *Bottle Blowers Assn., supra,* at 475; *Wirtz* v. *Laborers' Union, supra,* at 483. The goal was to "protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and, through the election process, to keep the union leadership responsive to the membership." *Wirtz* v. *Hotel Employees, supra,* at 497.

Whether a particular qualification is "reasonable" within the meaning of § 401 (e) must therefore "be measured in terms of its consistency with the Act's command to unions to conduct 'free and democratic' union elections." 391 U. S., at 499. Congress was not concerned only with corrupt union leadership. Congress chose the goal of "free and democratic" union elections as a preventive measure "to curb the possibility of abuse by benevolent as well as malevolent entrenched leadership." *Id.,* at 503. *Hotel Employees* expressly held that that check was seriously impaired by candidacy qualifications which substantially deplete the ranks of those who might run in

opposition to incumbents, and therefore held invalid the candidacy limitation there involved that restricted candidacies for certain positions to members who had previously held union office. "Plainly, given the objective of Title IV, a candidacy limitation which renders 93% of union members ineligible for office can hardly be a 'reasonable qualification.' " *Id.*, at 502.

## III

Applying these principles to this case, we conclude that here, too, the antidemocratic effects of the meeting-attendance rule outweigh the interests urged in its support. Like the bylaw in *Hotel Employees,* an attendance requirement that results in the exclusion of 96.5% of the members from candidacy for union office hardly seems to be a "reasonable qualification" consistent with the goal of free and democratic elections. A requirement having that result obviously severely restricts the free choice of the membership in selecting its leaders.

Petitioners argue, however, that the bylaw held violative of § 401 (e) in *Hotel Employees* differs significantly from the attendance rule here. Under the *Hotel Employees* bylaw no member could assure by his own efforts that he would be eligible for union office, since others controlled the criterion for eligibility. Here, on the other hand, a member can assure himself of eligibility for candidacy by attending some 18 brief meetings over a three-year period. In other words, the union would have its rule treated not as excluding a category of member from eligibility, but simply as mandating a procedure to be followed by any member who wishes to be a candidate.

Even examined from this perspective, however, the rule has a restrictive effect on union democracy.[6] In the absence

---

[6] Petitioners argue that attendance at 18 relatively short meetings over three years is no very onerous burden on a union member. But this argument misconceives the evil at which the statute aims. We must

of a permanent "opposition party" within the union, opposition to the incumbent leadership is likely to emerge in response to particular issues at different times, and member interest in changing union leadership is therefore likely to be at its highest only shortly before elections.[7]  Thus it is probable that to require that a member decide upon a potential candidacy at least 18 months in advance of an election when no issues exist to prompt that decision may not foster but discourage candidacies and to that extent impair the general membership's freedom to oust incumbents in favor of new leadership.

Nor are we persuaded by petitioners' argument that the Secretary has failed to show an antidemocratic effect because he has not shown that the incumbent leaders of the union became "entrenched" in their offices as a consequence of the operation of the attendance rule.  The reasons for leaderships becoming entrenched are difficult to isolate.  The election of the same officers year after year may be a signal that antidemocratic election rules have prevented an effective challenge to the regime, or might well signal only that the members are satisfied with their stewardship; if elections are uncontested, opposition factions may have been denied access to the ballot, or competing interests may have compromised differences before the election to maintain a front of unity.  Conversely, turnover in offices may result from an open political process, or from a competition limited to candidates who offer no real opposition to an entrenched establishment.  But Congress did not saddle the courts with the duty to search out and remove improperly entrenched union leaderships  Rather, Congress chose to guarantee union democracy

judge the eligibility rule not by the burden it imposes on the individual candidate but by its effect on free and democratic processes of union government.  *Wirtz* v. *Hotel Employees*, 391 U. S., at 499.

[7] The Secretary suggests that in most unions there is no such organized opposition and that the pattern described in the text is indeed typical.

by regulating not the results of a union's electoral procedure but the procedure itself. Congress decided that if the elections are "free and democratic," the members themselves are able to correct abuse of power by entrenched leadership. Procedures that unduly restrict free choice among candidates are forbidden without regard to their success or failure in maintaining corrupt leadership.

Petitioners next argue that the rule is reasonable within § 401 (e) because it encourages attendance at union meetings, and assures more qualified officers by limiting election to those who have demonstrated an interest in union affairs, and are familiar with union problems. But the rule has plainly not served these goals. It has obviously done little to encourage attendance at meetings, which continue to attract only a handful of members.[8] Even as to the more limited goal of encouraging the attendance of potential dissident candidates, very few members, as we have said, are likely to see themselves as such sufficiently far in advance of the election to be spurred to attendance by the rule.

As for assuring the election of knowledgeable and dedicated leaders, the election provisions of the LMRDA express a congressional determination that the best means to this end is to leave the choice of leaders to the membership in open democratic elections, unfettered by arbitrary exclusions. Pursuing this goal by excluding the bulk of the membership from eligibility for office, and thus limiting the possibility of dissident candidacies, runs directly counter to the basic premise of the statute. We therefore conclude that Congress, in guaranteeing every union member the opportunity to hold office, subject only to "reasonable qualifications,"

---

[8] Attendance at Local 3489's meetings averages 47 out of approximately 660 members. There is no indication in the record that this total represents a significant increase over attendance before the institution of the challenged rule.

disabled unions from establishing eligibility qualifications as sharply restrictive of the openness of the union political process as is petitioners' attendance rule.

## IV

Finally, petitioners argue that the absence of a precise statement of what the Secretary of Labor and the courts will regard as reasonable prevents the drafting of a meeting-attendance rule with any assurance that it will be valid under § 401 (e). The Secretary, to whom Congress has assigned a special role in the administration of the Act, see *Calhoon* v. *Harvey*, 379 U. S. 134, 140 (1964); *Dunlop* v. *Bachowski*, 421 U, S. 560 (1975), has announced the following view:

> "Experience has demonstrated that it is not feasible to establish arbitrary guidelines for judging the reasonableness of [a meeting-attendance eligibility requirement]. Its reasonableness must be gauged in the light of all the circumstances of the particular case, including not only the frequency of meetings, the number of meetings which must be attended and the period of time over which the requirement extends, but also such factors as the nature, availability and extent of excuse provisions, whether all or most members have the opportunity to attend meetings, and the impact of the rule, i. e., the number or percentage of members who would be rendered ineligible by its application." 29 CFR § 452.38 (a) (1976).

Obviously, this standard leads to more uncertainty than would a less flexible rule. But in using the word "reasonable," Congress clearly contemplated exactly such a flexible result. Moreover, on the facts of this case and in light of *Hotel Employees*, petitioners' contention that they had no way of knowing that a rule disqualifying over 90% of a local's

members from office would be regarded as unreasonable in the absence of substantial justification is unpersuasive.[9]

*Affirmed.*

Mr. Justice Powell, with whom Mr. Justice Stewart and Mr. Justice Rehnquist join, dissenting.

The petitioners' attendance rule, imposed by the constitution of the International Steelworkers' Union, provides that no member shall be eligible for election to a local union office unless he has attended one-half of the regular meetings of his local union during the preceding 36 months. The Court holds today, resolving a conflict among the Circuits, that this eligibility requirement is not reasonable within the meaning of § 401 (e) of Title IV of the Labor-Management Reporting and Disclosure Act, 29 U. S. C. § 481 (e). As this holding seems to me to be an unwarranted interference with the right of the union to manage its own internal affairs, I dissent.

Stated broadly, the purpose of Title IV of the Act is to insure "free and democratic" elections. But

> "[t]he legislative history [of the Act] shows that Congress weighed how best to legislate against revealed abuses in union elections without departing needlessly from its long-standing policy against unnecessary governmental intrusion into internal union affairs." *Wirtz* v. *Bottle Blowers Assn.*, 389 U. S. 463, 470–471 (1968); *Wirtz* v. *Hotel Employees*, 391 U. S. 492, 496 (1968).

---

[9] Also unpersuasive is the argument that a union cannot know in advance how many of its members will be disqualified by a meeting-attendance rule. While the precise number may not be predictable, petitioners must have had some awareness of the general attendance rate at union meetings, and if Local 3489's attendance rate is at all typical (and there is no contention that it is not), it should have been fairly obvious that a rule disqualifying all who had not maintained 50% attendance for three years, admittedly one of the most stringent such rules among labor unions, would have a significant antidemocratic impact.

Section 401 (e) reflects a congressional intent to accommodate both of these purposes. It provides that a labor organization may set "reasonable qualifications uniformly imposed" for members in good standing who wish to be candidates and to hold office. There is no contention that the attendance rule in question was not "uniformly imposed." Nor does the rule render ineligible for office any member who displays enough interest to attend half of his local's meetings.

The Court nevertheless, relying heavily on *Hotel Employees,* holds that this rule imposes an unreasonable qualification, violative of § 401 (e). *Hotel Employees* involved a "prior office" rule that limited candidates for local union office to members who previously had held elective union office. The Court's opinion in that case emphasized that the effect of the prior-office rule was to disqualify 93.1% of the union's membership. In this case, the respondent argues that *Hotel Employees* enunciated a *per se* "effects" rule, requiring invalidation of union elections whenever an eligibility rule disqualifies all but a small percentage of the union's membership. Although the Court today does not in terms adopt a *per se* "effects" analysis, it comes close to doing so. The fact that 96.5% of Local 3489's members chose not to comply with its rule was given controlling weight.

In my view, the Court has extended the reach of *Hotel Employees* far beyond the holding and basic rationale of that case. Indeed, the rule there involved was acknowledged to be a sport—"virtually unique in trade union practice." 391 U. S., at 505. It was a rule deliberately designed, as intimated by the Court's opinion, to entrench union leadership. *Id.,* at 499. Moreover, the general effect of the rule in *Hotel Employees* was predictable at the time the rule was adopted. By limiting eligibility to members who held or previously had held elective office, the disqualification of a large proportion of the membership was a purposeful and inevitable effect of the structure of the rule itself. The attendance

rule before the Court today has no comparable feature. No member is precluded from establishing eligibility. Nor can the effect of the rule be predicted, as any member who demonstrates the requisite interest in union affairs is eligible to seek office. In short, the only common factor between the prior-office rule in *Hotel Employees* and that before the Court today is the similarity in the percentage of ineligible members. But in one case the effect was predetermined for the purpose of perpetuating control of a few insiders, whereas here the effect resulted from the free choice—perhaps the indifference—of the rank-and-file membership.

In *Brennan* v. *Steelworkers,* 489 F. 2d 884 (1973), the Court of Appeals for the Sixth Circuit sustained the validity of the identical rule at issue here. In distinguishing *Hotel Employees,* it said:

> "The self-evident restrictive character of the 'prior office holding' rule, when accompanied by the numerical effect of drastically limiting the number of eligible candidates for office, justifies the result in *Hotel Employees.* It is, however, erroneous to conclude, as the Secretary contends, that *Hotel Employees* commands blind adherence to a per se theory even where, as here, the rule does not by itself disqualify anyone and . . . does serve legitimate union objectives." 489 F. 2d, at 889.

The court went on to conclude that the purposes served by this attendance rule are legitimate.

Although the opinion of the Court today discounts the weight to be given these purposes, I agree with the Sixth Circuit that at least facially they serve legitimate and meritorious union purposes: (i) encouraging attendance at meetings; (ii) requiring candidates for office to demonstrate a meaningful interest in the union and its affairs; and (iii) assuring that members who seek office have had an opportunity to become informed as to union affairs. One may argue that

requiring attendance at 18 of the 36 meetings prior to the election goes beyond what may be necessary to serve these purposes. But this is a "judgment call" best left to the unions themselves absent a stronger showing of potential for abuse than has been made in this case.

The record in this case is instructive. Twenty-three members were eligible to run for office in the 1970 election. These were members who were nominated and who also had complied with the attendance requirement. The record does not show, and indeed no one knows, how many members were eligible under the rule but who were not nominated. Three candidates competed for the office of president, four for the three trustee offices, and six ran unopposed for the remaining offices. Of the 10 officers elected, six were incumbents. Nonincumbents were elected to the offices of vice president, treasurer, recording secretary, and the minor office of guide. There was no history of entrenched leadership and no evidence of restrictive union practices precluding free and democratic elections. Indeed, the record is to the contrary. Five different presidents had been elected during the preceding 10 years, and an estimated 40 changes in officers had occurred in the course of four separate elections. Bernard Frye, who initiated this case by complaint to the Secretary, won the presidency in an election subsequent to 1970 and thereafter lost it.

In the final analysis, respondent, who bears the burden of proving that the rule is "unreasonable," rests his entire case on a facial attack upon the attendance rule itself, an attack supported by a statistical "effects test" that at best is ambiguous and one that could invalidate almost any attendance requirement that served legitimate union purposes. In my view, the respondent has failed to prove that the rule is unreasonable. For these reasons, I would reverse the judgment of the Court of Appeals.