**Ray MARSHALL, Secretary of Labor, Plaintiff,**

v.

**ILLINOIS EDUCATION ASSOCIATION, Defendant.**

**No. 77–3146.**

United States District Court, C. D. Illinois, Springfield Division.

January 7, 1981.

U. S. Dept. of Justice, Hattie Baldwin, Trial Atty., Gen. Litigation Section, Washington, D. C., for plaintiff.

Irving Friedman, Nancy E. Tripp, Katz, Friedman, Schur & Eagle, Chicago, Ill., for defendant.

## ORDER

J. WALDO ACKERMAN, District Judge.

On September 30, 1977, a complaint was filed by the Secretary of Labor against defendant, Illinois Education Association, pursuant to Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 401, *et seq.*). Plaintiff's complaint alleged that the Illinois Education Association (hereinafter IEA) was a labor organization within the meaning of Section 3(i) of the Act (29 U.S.C. § 402(i)), and that the defendant had violated Section 401(d) of the Act (29 U.S.C. § 481(d)) by appointing a Treasurer rather than electing a Treasurer by secret ballot among the members in good standing who had themselves been elected by secret ballot. The Secretary sought an order requiring defendant to conduct an election for the office of treasurer under the supervision of the Secretary of Labor.

On October 10, 1978, this Court issued an order granting plaintiff's Motion for Partial Summary Judgment, holding that the position in question was within the definition of "officer" as set forth in the Act; therefore, the treasurer should be elected in accordance with the provisions of the Act rather than appointed. The Court's order of October 10, 1978, left the issue of whether defendant was a labor organization within the meaning of the Act to be decided at a subsequent hearing.

This issue was resolved without the necessity of a hearing as the result of a Stipulation entered into by the parties on April 22, 1980, in which defendant acknowledged that it was a labor organization within the meaning of the Act and, therefore, subject to the provisions of Title IV. In addition, it was agreed by the parties that the plaintiff was entitled to the entry of an order requiring defendant to conduct an election for the

Gerald D. Fines, U. S. Atty., John Germeraad, Asst. U. S. Atty., Springfield, Ill., Janet Graney, Ronald Spann, Herman Grant, Regional Sol., U. S. Dept. of Labor, Chicago, Ill., Barbara A. Babcock, Civ. Div.,

office of secretary-treasurer under plaintiff's supervision.

The issue now confronting this Court is the alleged conflict between § 401(e) of the Act (29 U.S.C. § 481(e)), and Article VI, § 4(e)(2) and Article VII, § 1(e) of the bylaws of the Illinois Education Association. Section 401(e) provides:

(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, ...

The Illinois Education Association's bylaws which allegedly conflict with the above statute are set forth below:

Article VI.

E. Election of Delegates.

1. The membership of each chartered local education association shall elect their allotted Representative Assembly delegates and alternates by secret ballot.

2. The Representative Assembly shall contain no less than 8% Ethnic/Minority delegates. In the event a minimum of 8% Ethnic/Minority delegates are not elected from chartered local education associations, the Board of Directors and the Ethnic/Minority Caucus, shall develop a plan to ensure 8% representation. Ethnic/Minority shall mean those persons designated as Ethnic/Minority by statistics published by the United States Bureau of the Census.

This designation shall specifically include Blacks, Mexican-American (Chicano), other Latino-culture groups, Orientals, and Indians.

Article VI, Section 4(E), 1978–79 By-Laws, IEA.

Article VII, Board of Directors

Section 1 Composition

E. For the purpose of Ethnic/Minority representation, the state shall be divided into four geographical sections established by the Board of Directors. The members within each section shall elect by open nomination and secret ballot one Ethnic/Minority representative and alternate.

These elections shall be conducted at a time and in a manner prescribed by the Board of Directors.

The term of office and eligibility for re-election of the Ethnic/Minority representative and alternate shall be the same as for regional chairpersons under Article XI.

Article VII, Section 1, 1978–79 By-Laws, IEA.

The plaintiff contends that qualifications for delegates and qualifications for the Board of Directors as set forth in the ByLaws of the Illinois Education Association are not reasonable within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 401 *et seq.*). It is well settled that the reasonableness of the particular eligibility requirement must be measured in terms with the command in the Act that unions conduct "free and democratic Union elections." A qualification is judged not by the burden it imposes on an individual candidate but by its effect on the free and democratic processes of union government. *Local 3489, United Steelworkers of America v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977). Any qualification must result in a reasonable opportunity to become a candidate, keeping in mind the Congressional policy that union election procedures be both fair and democratic. *Hodgson v. District 6, United Mine Workers*, 474 F.2d 940 (6th Cir. 1973). Clearly, candidacy qualifications which unduly restrict the ranks of those who might run in opposition to incumbents are not reasonable qualifications within the meaning of the Act. Such unduly restrictive candidacy qualifications result in abuses of entrenched leadership that the Labor-Management Reporting and Disclosure Act was enacted to curb. *See,*

*Wirtz v. Hotel, Motel and Club Employees' Union*, 391 U.S. 492, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968). Qualifications which enact almost absolute bars to candidacy of large numbers of union members have been found to be in violation of the Act. *See, Local 3489, United Steelworkers of America v. Usery*, 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977); *Wirtz v. Hotel, Motel and Club Employees' Union, Local 6, supra.*

■ On the other hand, the Act was not intended to take autonomy away from the labor unions. Instead, it was designed to promote union autonomy while fostering the highest standards of responsibility and ethical conduct. In *Wirtz v. Hotel, Motel and Club Employees' Union, Local 6 No. 513*, 381 F.2d 500 (2d Cir. 1967), the Court stated at p. 504:

> In deciding the issue of reasonableness we must keep in mind the fact that the act did not purport to take away from labor unions the governance of their own internal affairs and hand that governance over either to the courts or to the Secretary of Labor. The Act strictly limits official interference in the internal affairs of the unions... The Act prescribes only certain basic minima and leaves the area not covered by these minimum prescriptions to the decisions of the unions themselves.

In Senate Report No. 187, the Committee stated that one of the governing principles of the proposed legislation was that of minimum interference by Government in the internal affairs of any private organization. *See,* S.Rep. No. 187, 86th Cong., 1st Sess. 7 (1959), reprinted in (1959) *U.S.Code Cong. and Ad.News*, pp. 2318, 2323. The Committee believed that only essential standards should be imposed by legislation. A second governing principle of the legislation, according to the Senate Report, was the assumption that the individual members are fully competent to regulate union affairs, given the maintenance of minimum democratic safeguards. In addition, the Committee opposed any paternalistic attempt to prescribe detailed procedures and standards for the conduct of union business. *Id.*

■ In sum, reasonableness is apparently a balancing process between "free and democratic elections" and the express Congressional policy of leaving to the unions the maximum of self-government.

> Reasonableness is not to be assessed *in vacui*, but in the light of the purposes which the Congress sought to achieve and the evils which it sought to eliminate. Union democracy, effective self-government, abolition of oligarchical cliques and self-serving union officers were in the forefront of Congressional thinking.

*Wirtz v. Local 153 Glass Bottle Blowers Association*, 244 F.Supp. 745, 749 (D.C.Pa. 1965), *vacated on other grounds* 372 F.2d 86 (3d Cir. 1966), *reversed on other grounds* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). Ultimately, the question of reasonableness must be decided by the courts in the light of the facts of particular cases, taking into consideration the propriety, wisdom or expediency of the regulations. *Id.*

The Department of Labor's interpretation of the reasonableness standard is found at 29 C.F.R. § 452.35 and § 452.36. The Department of Labor recognized that labor organizations might have a legitimate institutional interest in prescribing minimum standards for candidacy and office holding in their organization. However, the Department stated that a dominant purpose of the Act is to ensure the right of members to participate fully in governing their union and to make its officers responsive to the members. The regulations promulgated by the Department of Labor state that the good judgment of members in casting their votes should be the primary determinate of whether the candidate is qualified to hold office. However, restrictions may be placed on the right of members to be candidates, but the restrictions must be closely scrutinized to determine whether they serve union purposes of such importance in terms of protecting the union as an institution as to justify subordinating the right of the individual member to seek office. At 29 C.F.R. § 452.36 the Department of Labor lists some factors to be considered in assessing the reasonableness of a qualification for union office, as follows:

1. The relationship of the qualification to the legitimate needs and interests of the union.

2. The relationship of the qualification to the demands of union office.

3. The impact of the qualification, in the light of the Congressional purpose of fostering the broadest possible participation in union affairs.

4. A comparison of a particular qualification with the requirements for holding office generally prescribed by their labor organizations; and,

5. The degree of difficulty in meeting a qualification by union members.

No case in point dealing with the reasonableness of an eligibility restriction based upon race has surfaced; however, the Court in *Shultz v. Local 1291, International Longshoremen's Association*, 338 F.Supp. 1204 (D.C.Pa.1972), held the bylaw of a local union requiring that the president be "of the colored race"; vice-president be of the white race; the recording secretary be of the white race; financial secretary colored, etc. to be unreasonable in that members of each race were disqualified entirely from holding certain offices. For instance, a white person could not be president of the local union, and a black person could not be vice-president of the local union. The facts of the case now before this Court are distinguishable from the facts of *Shultz*.

In 1974, the Illinois Education Association had no minority officers, no minority members of the fifty-man Board of Directors, and only five to ten delegates to the Representative Assembly, whose members totalled approximately six hundred members. The ethnic-minority participation in the union was minimal in proportion to the estimated number of minority members. While the IEA kept no record of the racial composition of its union, the IEA did represent 50,000 teachers in the state. The ethnic-minority composition of teachers state-wide, according to figures kept by the State of Illinois, was fifteen per cent of the total number of teachers. Recognizing the lack of participation by ethnic-minority groups in union affairs, delegates at the convention adopted a resolution by majority vote. The resolution was adopted with the goal that the Representative Assembly should contain eight per cent ethnic-minority delegates. The bylaws in question here were drafted in accordance with this resolution and provide that if eight per cent or more of the delegates regularly elected are ethnic-minority members then the election is final and complete. However, in the event that the regular process does not result in election of eight per cent ethnic-minority members, then a number of delegates sufficient to constitute eight per cent of the delegates to the Assembly would be added to the delegates elected by the members in the regularly scheduled election. The ethnic-minority add-on delegates are selected by the Board of Directors, who are nominated and elected by the members of the IEA. The four minority seats on the Board of Directors were added in 1974 to the number already existing, thereby at no time excluding anyone from candidacy for office.

In determining whether these particular bylaws are violative of the reasonableness standard, it is important to note that these candidacy qualifications are not unduly restrictive, such that large numbers of union members are unable to run for union office. These bylaws, likewise, do not result in the abuses of entrenched leadership which the statute was enacted to curb. In fact, the add-on plan provided for by the bylaws in question are consistent with the Act's command to the union to conduct free and democratic union elections allowing participation by all facets of the union, and have accomplished their goal of minority participation in union governance. It is my opinion that the qualifications imposed by the challenged bylaws of the IEA pose a small burden to the individual candidate, and beneficially effect the free and democratic processes of union government in making the union more responsive to its membership.

The purpose sought to be attained by the candidacy restrictions of the bylaws is legitimate and might not be attained in any manner less destructive of other legally

protected interests. Initiation of private and voluntary affirmative action programs such as the Plan now before the Court are not prohibited by federal law, and need not be the result of any judicial finding of past discrimination. *See, United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). A requirement of a judicial finding of past discrimination would "foreclose the union's self-examination and elimination of the vestiges of injustice deep-rooted in this society." *Id.* at p. 204, 99 S.Ct. at p. 2728. However, under *Weber* an affirmative action plan must be a temporary one remedial in its nature.

The affirmative action plan set forth in the IEA bylaws in question here is temporary in nature. Once the normal election process yields eight per cent minority delegates, no add-on delegates will be necessary to achieve the eight per cent ethnic-minority goal.

My determination that the bylaws of the Illinois Education Association impose reasonable qualifications for the candidacy for union membership is in keeping with the Congressional goal of minimal interference to the self-government and internal affairs of unions as expressed in *Wirtz v. Hotel, Motel and Club Employees' Union, Local 6, supra.* The legitimate and laudable goal of the union in attempting to secure representation for the ethnic-minority members previously denied them does not impinge upon the principle of free and democratic elections under the facts of this case. Consequently, for the reasons above stated, I find that the bylaws of the defendant Illinois Education Association are not in violation of Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (29 U.S.C. § 401 *et seq.*) in that they are reasonable qualifications uniformly imposed.

Accordingly, plaintiff is ordered to apply Article VI, § 4(e)(2) and Article VII, § 1(e) of the IEA's bylaws in the conduct of any subsequent supervised election.