**Raymond J. DONOVAN, Secretary of Labor, U.S. Department of Labor, Plaintiff,**

v.

**CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT), Defendant.**

No. 84 C 1724.

United States District Court, N.D. Illinois, E.D.

Nov. 29, 1984.

---

Joan Laser, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Paul L. Glover, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The Secretary of Labor ("the Secretary") brought this action against the defendant-union ("the Union") under § 401(e) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481(e), alleging that the Union denied its members a reasonable chance for nominating candidates in an election for Secretary of the Union. The parties agree on the material facts and have filed cross-motions for summary judgment under Fed.R.Civ.P. 56, along with excellent supporting memoranda. For the reasons stated below, the Court grants summary judgment in favor of the Union and dismisses the action.

### I.

The Union scheduled an election for the office of Secretary on October 12, 1983. Article III of the Union's constitution governed the conduct of the election. Article III, Section 2.1 sets forth the nomination procedure:

> Section 2.1 *Petitions for Nominations.* All nominations of candidates for any office shall be by petition which shall be signed by not less than two hundred fifty nor more than one thousand members who would have been eligible to vote on June first immediately prior to the election for which said petition is filed. No member may sign more than one nominating petition for each office to be filed at any election. If a member has signed the nominating petition for more than one candidate for the same office, said signatures shall be invalid on all petitions. The nominating petition, and each

sheet thereof, shall be in the form prescribed by the Board of Governors.

This nomination requirement of two hundred fifty unduplicated signatures, or 3.8% of the Union's membership, is the focal point of this case. At the time of the election, the Union was composed of about 6,500 members who were employed by some 800 employers located primarily in Illinois, Wisconsin and Michigan. About 6,000 of these members were concentrated within a 75 mile radius of downtown Chicago.

On March 25, 1983, the Union sent a "Notice of Nomination and Election" to all of its members. The Notice told the members of the relevant requirements of the election process, including the petition requirements. On June 6, 1983, Tony Cullotta ("Cullotta"), the incumbent Secretary, and Jerry Picardi ("Picardi"), the complainant, picked up nominating petitions, a Memorandum and a copy of the Union's constitution. The Memorandum repeated the requirement that each candidate had to submit 250 unduplicated signatures between July 5, 1983 and August 3, 1983 in order to make the ballot. Cullotta and Picardi also received a list of the Union's stewards and a computer printout listing the names and addresses of the 800 employers of Union members. The printout did not list the number of members employed by each employer. Sometimes it listed the main office address of each office, but not the location from which drivers were dispatched or when they started or returned.

Picardi states that he and his four helpers ran into some problems obtaining signatures, mostly because some employers denied them access to terminals or dispatch areas. Cullotta had considerably less difficulty getting signatures. He was a "Field Representative" as well as Secretary, and he had four fellow Field Representatives helping him. Field Representatives regularly visit plant sites on Union business. As such, they gain easier access into plants than an ordinary member like Picardi can, and thus Cullotta and his helpers harvested more signatures than did Picardi and his

men. On July 18, 1983, Cullotta submitted forty nominating petitions bearing about 1,000 signatures, the maximum under the Union's constitution. Picardi submitted 303 signatures on August 3, 1983, the last day for submitting petitions. Of these signatures, the Union cut 47 because they were duplicated on Cullotta's petitions, ten because they were not members in good standing as of June 1, 1983, ten because they could not be verified and two because they had signed Picardi's petitions twice. These cuts dropped Picardi 16 signatures below the 250 minimum. The Union's Executive Directors, Mike Keegan ("Keegan"), notified Picardi by letter dated August 15, 1983, that the Union had disqualified him because of his failure to cross the minimum signature threshold. Because the filing deadline had passed, Picardi had no opportunity to submit additional signatures. Unopposed, Cullotta won re-election.

After being stricken from the ballot, Picardi wrote to Keegan to protest. The Union's Board of Governors wrote back that it had denied his protest. Having thus exhausted his internal Union remedies, Picardi filed a timely protest with the Secretary of Labor. Pursuant to 29 U.S.C. § 482(b), the Secretary initially decided not to pursue the case, but after further investigation, tried unsuccessfully to negotiate a settlement. This lawsuit followed.

## II.

The Secretary argues that the Union's requirement of 250 unduplicated signatures violates Title IV of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). 29 U.S.C. § 481 *et seq.* Specifically, the Secretary claims that the signature minimum denies Union members a "reasonable opportunity ... for the nomination of candidates," in violation of 401(e) of the LMRDA. That section provides:

---

**1.** The Secretary's interpretative regulations are not binding on the courts, but they are entitled to some weight when deciding what qualifications are reasonable in the gray areas of the

(e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof.... The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

29 U.S.C. § 481(e). Should we find that the petition process violates the "reasonableness" requirement of § 401(e), we must "declare the election ... to be void and direct the conduct of a new election...." 29 U.S.C. § 482(c)(2). This is apparently the first case challenging a Union's signature requirement.

Deciding whether a rule or conduct is "reasonable" is not a simple task. Our survey of the Secretary's Interpretative Regulations and Supreme Court precedent does not reveal a precise definition for us to apply. The Secretary and the Supreme Court have admitted that "whether a qualification is reasonable is a matter which is not susceptible of precise definition, and will ordinarily turn on the facts of each case." 29 C.F.R. § 452.36(a); *see Local 3489, United Steelworkers v. Usery,* 429 U.S. 305, 313, 97 S.Ct. 611, 616–17, 50 L.Ed.2d 502 (1977). However, the legislative history and the Secretary's regulations [1] do provide some focus for our scrutiny of the petition requirement.

■ Congress passed Title IV of the LMRDA to ensure free and democratic Union elections; the legislative history reveals

---

LMRDA. *Usery v. Local Div. 1205, Amalgamated Transit Union,* 545 F.2d 1300, 1304 (1st Cir. 1976).

that Title IV strikes a balance between correcting abuses in union elections on the one hand, and, on the other hand, not straying needlessly from the federal policy of letting unions manage their internal affairs. *Wirtz v. Local 153, Glass Bottle Blowers Assn.*, 389 U.S. 463, 470–71, 88 S.Ct. 643, 647–48, 19 L.Ed.2d 705 (1968). Under Title IV, unions clearly may impose reasonable qualifications uniformly on their candidates. While we must carefully avoid unnecessarily telling the Union how to run its elections, we must not be overly deferential. " 'Congress plainly did not intend that the authorization ... of reasonable qualifications ... should be given a broad reach.' " *Local 3489*, 429 U.S. at 309, 97 S.Ct. at 614, *quoting Wirtz v. Hotel Employees Union, Local 6*, 391 U.S. 492, 499, 88 S.Ct. 1743, 1748, 20 L.Ed.2d 763 (1968). In analyzing the Union's petition requirement, we use the "free and democratic" political process as a guidepost,[2] assuming that Union voters will cast their ballots wisely if given a fair chance to do so. *Id.* In sum, we may justifiably interfere with the Union's conduct of its election if it has somehow sabotaged the democratic process.

The Secretary's interpretative regulations offer some guidance in assessing the reasonableness of the signature requirement. 29 C.F.R. § 452.36 sets forth five factors to consider:

1. The relationship of the qualification to the legitimate needs and interest of the union;

2. The relationship of the qualification to the demands of union office;

3. The impact of the qualification, in the light of the Congressional purpose of fostering the broadest possible participation in union affairs;

4. A comparison of the particular qualification with the requirements for holding office generally prescribed by other labor organizations; and

5. The degree of difficulty in meeting a qualification by union members. (29 C.F.R. 452.36).

With these additional considerations in mind, we turn to the Secretary's challenge of the petition requirement.

### III.

The Secretary argues that the requirement of 250 unduplicated signatures unreasonably impairs the Union's democratic processes. He concedes that a signature requirement in general, and a 3.8% requirement in particular, may be reasonable, but concludes that the rule barring duplicated signatures unreasonably hinders non-incumbent candidates in this Union from meeting the minimum. The Secretary reasons that the rule is unfair because candidates do not have notice of the actual number of signatures needed to get nominated. Members must obtain some vague number well over 250 in order to create a duplication "cushion." The Secretary believes that a better rule would either eliminate the duplication requirement or allow candidates a short grace period after the filing deadline to submit more signatures. The Secretary emphasizes the factual context of his argument. Because the employers of this Union's members are dispersed, it is difficult to garner signatures. Challengers like Picardi—unlike incumbent Field Representatives—find it hard to gain access to plants, and when they do they might not be there when drivers are coming or going. Given this factual context, argues the Secretary, the signature requirement becomes even more stringent. Despite these arguments, we do not agree that the requirement of 250 unduplicated signatures shackles the exercise of the Union's democracy in violation of the LMRDA.

We note again that the LMRDA's "reasonableness" requirement does not license this Court to run the Union. The question here is not whether we or the Secretary can think of better or ideal nomination pro-

**2.** The political process provides only a rough model, not a blueprint for the conduct of Union elections. *See Donovan v. Dist. Lodge 100*, 666 F.2d 883, 889 (5th Cir.1982).

cesses, but whether the process this Union has created is a "reasonable" one.

As the Secretary concedes, a petition requirement in general is reasonable and serves legitimate Union needs. *See* 29 C.F.R. § 452.57. A petition requirement ensures that candidates can marshal minimal support, thereby eliminating fringe candidates. The duplication rule furthers this goal by ensuring that a candidate can drum up enough independent preliminary support of a small portion of the electorate to justify holding an election. Moreover, the minimum culls out a candidate who is not serious enough about his or her candidacy to put out the effort to get enough signatures.

■ Of course, petition requirements can become unreasonable if the minimum number of signatures is too high. *Cf. Smith v. Bd. of Election Commissioners For The City of Chicago,* 587 F.Supp. 1136 (N.D.Ill. 1984). But we believe that the requirement of preliminary support from 3.8% of the membership is not unreasonably burdensome, even if it cannot be the same 3.8% (or even about 15%, as in this case) which supports another candidate. The dispersion of the 6,500 members among 800 employers does not render the 3.8% minimum unreasonable. Each candidate receives the addresses of the employers, the vast majority of whom are concentrated in the Chicago area. While some of these addresses were of central offices, no evidence suggests there were so many as to lead candidates on a wild goose chase to find the locations from which drivers come and go. We recognize that meeting the minimum is not easy, but neither is it unreasonably hard. We find especially persuasive the historical and uncontested fact that fourteen out of the last sixteen elections were contested, including two this year. In five of these elections, more than two candidates made the ballot. In sum,

we do not believe that the petition requirement unreasonably impairs broad membership participation in Union affairs.

The petition requirement is far less restrictive than the Supreme Court cases invalidating Union elections. In *Hotel Employees, supra,* a Union bylaw on its face rendered 93% of Union members ineligible to run for office. In *Local 3489, supra,* the Union allowed a candidate to run only if he or she attended 75% of the Local's meetings during the three years before the election. Unlike *Hotel Employees'* bylaw, the *Local 3489* bylaw excluded no categories of members, but merely erected a fairly high procedural hurdle, one that could have been viewed as furthering legitimate Union interests. Yet because the bylaw had the effect of excluding 96.5% of the rank and file from candidacy, the Supreme Court held that it "hardly seems to be a 'reasonable qualification' consistent with the goal of free and democratic elections." 429 U.S. at 310, 97 S.Ct. at 615. From these two cases we see that Union bylaws which exclude most Union members from candidacy violate the LMRDA. However, the signature requirement at issue here does not present so egregious a case. The requirement excludes no one by class; nor have we been presented with evidence that the requirement has a significant *de facto* chilling effect on candidates, as was the case in *Local 3489.* As noted above, most of the Union's elections are contested. In sum, the Supreme Court cases do not suggest that the petition requirement in this case is unreasonable.[3]

We disagree with the Secretary's argument that candidates do not have actual notice of the number of signatures since they do not know in advance how many signatures are duplicated. The Secretary admits that candidates have adequate notice of the 250 signature minimum and of

---

3. We do not mean to imply that the Supreme Court cases set the lower bounds of what is reasonable. Less restrictive requirements may still violate the LMRDA. *See, e.g., Donovan v. Local Union No. 120, Laborers,* 683 F.2d 1095 (7th Cir.1982) ("competency" requirement void

for vagueness); *Usery v. District 22, United Mine Workers of America,* 543 F.2d 744 (10th Cir. 1976) (requirement that candidate be nominated by five locals was unreasonable); *generally* Annot. 24 A.L.R.Fed. 651 (1975).

the requirement that these signatures must be unduplicated. His complaint can be made of all signature requirements, including the other requirements in this case which the Secretary does not challenge. For example, ten signatures were removed because they were not those of members in good standing, and ten because they could not be verified. While Picardi could not have known how many of these kinds would be stricken, the Secretary does not raise a notice argument as to these requirements. Similarly, looking for guidance from our rough model, the political context, we see that signatures are commonly stricken for various reasons, yet this does not render a political signature minimum vague or illusory. A signature "cushion" is necessary for all petition requirements, no matter how reasonable.

We also reject the Secretary's argument that the current system is subject to serious abuse. He suggests that an unscrupulous incumbent can follow a challenger from plant to plant, secure duplicated signatures, and still have enough of a cushion to meet the minimum himself. We observe first that no evidence suggests that this type of skullduggery happened in this case. In any event, the Union's constitution protects against abuses of this type. In addition to laying a floor of 250 signatures, it erects a ceiling of 1,000 signatures. Where, as here, a candidate secures 1,000 signatures, an opposing candidate still has 5,500 signatures available to him. While this safeguard does not fully prevent the devious incumbent from snooping around after the challenger, it does prevent one candidate from cornering the market. Evidence of foul play could very well invalidate an election in which it occurs, but the unlikely possibility of this kind of mischief does not, we believe, render the whole signature requirement unreasonable.

## IV.

The Union's signature requirement does not unreasonably deprive members of an opportunity to nominate candidates for Union office. Accordingly, the Secretary's motion for summary judgment is denied, the Union's is allowed, and the case is dismissed. It is so ordered.

