Lynn MARTIN, Secretary of Labor, United States Department of Labor, Plaintiff–Appellee,

v.

BRANCH 419, NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, Defendant–Appellant.

No. 91–5910.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1992.

Decided May 27, 1992.

D. Gregory Weddle, Asst. U.S. Atty., Office of U.S. Atty., Knoxville, Tenn. (briefed), William H. Berger, Office of Sol.,

U.S. Dept. of Labor, Atlanta, Ga. (argued), for plaintiff-appellee.

Michael J. Passino, Nashville, Tenn., Keith Secular (argued), Gary Gordon (briefed), Cohen, Weiss & Simon, New York City, for defendant-appellant.

Before: NELSON and BOGGS, Circuit Judges; and BERTELSMAN, Chief District Judge.*

DAVID A. NELSON, Circuit Judge.

Subject to certain statutory exceptions, and "subject to ... reasonable qualifications uniformly imposed," every labor union member in good standing is eligible to run for and to hold union office. § 401(e) of the Landrum–Griffin Act, 29 U.S.C. § 481(e).

The National Association of Letter Carriers, a labor union subject to the Act, has constitutional provisions saying that any member who "holds, accepts, *or applies for* a supervisory position in the Postal Career Service" is ineligible to run for union office until two years have elapsed. (Emphasis supplied.) Regulations adopted by the Secretary of Labor make it clear that "supervisors ... may not be candidates for or hold [union] office," 29 C.F.R. § 452.47, but the question presented in this appeal is whether it is reasonable for a union to disqualify members from running for union office merely because they are aspiring supervisors. The Secretary maintains that it is unreasonably restrictive to say that a candidate for union office must not have applied for a supervisory position within two years; the union defends this qualification as a reasonable means of guarding against actual and potential conflicts of interest.

The district court held that the qualification is not reasonable and thus not lawful. We conclude that the qualification is reasonable, and we shall reverse the summary judgment entered by the district court in favor of the Secretary.

## I

The National Association of Letter Carriers held its 56th biennial convention at Portland, Oregon, in August of 1988. Constitutional provisions in effect at that time said that all regular members were eligible for union office, except that any member accepting a supervisory position in the Postal Career Service would thereby become ineligible and would remain ineligible for two years after the termination of such supervisory status. Applicants for supervisory positions were not disqualified unless and until they accepted appointment.

Numerous constitutional amendments were proposed at the convention, including two designed to disqualify applicants for supervisory positions from holding union office. (One of the amendments related to the qualifications of convention delegates, and the other to the qualifications of branch officers.) These amendments were proposed not by the union's Executive Council, but by Branch 262 of Battle Creek, Michigan.

The national union's Committee of Laws initially voiced disapproval of the proposed amendments. Noting that it was not clear the amendments would be legal, the committee told the convention that the existing provisions were both lawful and sufficient to protect against conflict-of-interest problems. The national president, Vincent Sombrotto, added that although at least one court had ruled that it would be illegal to disqualify someone who had applied for a supervisory position, the union had recently learned that there were decisions going the other way.

A delegate from Branch 262 then made the following remarks in favor of the amendment relating to the qualifications of delegates:

"Our idea behind this was to give our members the undivided loyalty that they deserve from their union representatives. Once a member applies for a management position, there could be pressure to win their supervisor's approval, trying to

---

* The Honorable William O. Bertelsman, Chief Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

impress their supervisor for their own advancement.

(*Applause.*)

Applying for a [supervisor's] position shows a conflict of interest. Our brothers and sisters in the APWU [American Postal Workers Union] have recently adopted this into their constitution; and March 2 of 1988, the United States Court of Appeals for the Sixth Circuit ruled in favor of the National Labor Relations Board, stating that the Postal Service must provide this information, and it is clearly a conflict of interest once a union representative applies for a management position." [1]

At the conclusion of the Michigan delegate's remarks, President Sombrotto said it was the Sixth Circuit decision to which he had made reference before. He stated that the legal question had been discussed with counsel that morning, and the conclusion was that the question remained open. With the apparent acquiescence of the Committee of Laws, Mr. Sombrotto went on to say that

> "[O]ur position, the NALC position, is if you want to be a supervisor, be a supervisor. If you want to be a letter carrier, be a letter carrier. You shouldn't have one foot in each camp, and the quicker we determine that the better off we are."

After a brief speech in opposition (by a delegate who was loudly booed, according to Mr. Sombrotto), the first of the two amendments was carried by voice vote. When the amendment relating to the qualifications of branch officers was subsequently proposed, a member of the Committee of Laws announced that the committee had changed its position from one of

disapproval to approval. The amendment was carried by a wide margin.

In January of 1989, well after the amendment had become effective, a man named William Olds, who worked as a city letter carrier at the post office in Knoxville, Tennessee, applied for a position as postmaster of Niota, Tennessee. Mr. Olds filled in a lengthy application form in which he said, among other things, that he had been a union steward for several months and in that capacity had worked closely with Postal Supervisor Keith Lowe. Supervisor Lowe was listed as a reference in three different sections of the application. The final section of the form called for recommendations from the applicant's immediate supervisor and next higher level supervisor. Those positions were occupied, in this instance, by James M. Vasser and M.E. Stevens. Mr. Vasser recommended Mr. Olds for the postmastership "without reservation," noting, among other things, that "he is very informed on labor contracts and is a fair person to deal with in settling disputes." Mr. Stevens concurred.

Although Mr. Olds appears to have been a strong candidate for the Niota postmaster's job, he was not appointed to that position. Whether his application was kept on file by the Postal Service we do not know. President Sombrotto gave a deposition in which he testified that postal management routinely retains applications for positions as supervisors, but it is not clear whether this includes applications for specific postmasterships. In any event, Mr. Olds was not subsequently appointed to any supervisory position with the Postal Service, and it has been stipulated that he never served in such a position.

---

1. The decision referred to is *NLRB v. U.S. Postal Service*, 841 F.2d 141 (6th Cir.1988), where this court granted enforcement of an NLRB order directing the Postal Service to advise the American Postal Workers Union whether local union officials had applied for supervisory positions. Our opinion referred to a 1984 amendment to the APWU constitution making applicants for supervisory positions ineligible for union office, and the opinion suggested that such prophylactic measures were supported by "the need to assure the complete devotion of union negotiating teams to employee interests...." *Id.* at 145,

quoting *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 8 (3d Cir.1969). Characterizing as "reasonable" the NLRB's determination that "a clear potential for conflict of interest problems" was indicated, we went on to explain that

> "[t]he desire for supervisor approval is likely to affect a union official's ability to represent the employees' interests when the positions are adverse. Conflict of interest problems are difficult to detect by their very nature, and thus, necessitate preventive measures." 841 F.2d at 145–46.

In November of 1989, approximately 10 months after the submission of his application for the postmastership, Mr. Olds and one other person were nominated as candidates for the office of vice-president of Branch 419 of the National Association of Letter Carriers. Pursuant to the amended version of the union constitution—adopted at a convention at which Branch 419 was presumably represented, of course—Mr. Olds was declared ineligible to run for office. Without opposition, the other candidate was then elected by acclamation.

After exhausting his internal union remedies, Mr. Olds filed a timely complaint with the Secretary of Labor under 29 U.S.C. § 482(a). The Secretary investigated the complaint, found probable cause to believe that a violation of the statute had occurred, and brought the present action against Branch 419 in the United States District Court for the Eastern District of Tennessee. See 29 U.S.C. § 482(b). The Secretary's complaint asked that Branch 419's election for the office of vice-president be declared null and void and that a new election be conducted under the Secretary's supervision.

On cross-motions for summary judgment, the district court concluded as a matter of law that the provision barring from union office persons who had merely applied for supervisory positions within the past two years constituted a qualification that was "unreasonable." The court entered judgment granting the relief sought by the Secretary, and this appeal followed.

## II

The "special function" of Title IV of the Landrum–Griffin Act, the title of which § 401 is a part, "is to insure 'free and democratic' elections." *Wirtz v. Hotel, Motel and Club Employees Union, Local 6,* 391 U.S. 492, 496, 88 S.Ct. 1743, 1746, 20 L.Ed.2d 763 (1968), quoting *Wirtz v. Local 153, Glass Bottle Blowers Ass'n.,* 389 U.S. 463, 470, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1968). Although Congress wanted to avoid unnecessary intervention in internal union affairs, it also wanted to protect the public interest and the rights and interests

of rank-and-file union members "by assuring that union elections would be conducted in accordance with democratic principles." *Wirtz v. Hotel Employees,* 391 U.S. at 496, 88 S.Ct. at 1746, citing *Wirtz v. Bottle Blowers,* 389 U.S. at 473, 88 S.Ct. at 649, and *Wirtz v. Local 125, Laborers Int'l. Union,* 389 U.S. 477, 483, 88 S.Ct. 639, 642, 19 L.Ed.2d 716 (1968).

■ Where a union adopts a qualification for office that may reflect a conflict between the interest of rank-and-file union members in participating fully in the operation of their union and the interest of an entrenched union leadership in perpetuating its own control, the statutory phrase "reasonable qualifications uniformly imposed" should be interpreted, if possible, in such a way as to vindicate the former interest in preference to the latter.

"Unduly restrictive candidacy qualifications can result in the abuses of entrenched leadership that the [Landrum–Griffin Act] was expressly enacted to curb. The check of democratic elections as a preventive measure is seriously impaired by candidacy qualifications which substantially deplete the ranks of those who might run in opposition to incumbents." *Wirtz v. Hotel Employees,* 391 U.S. at 499, 88 S.Ct. at 1748.

The particular qualification at issue in *Wirtz v. Hotel Employees*—a union bylaw limiting eligibility for major elective offices to members who held or had previously held elective office—excluded all but about six or seven percent of the union's membership from the pool of potential candidates. The Supreme Court, not surprisingly, held this qualification unreasonable:

"Plainly, given the objective of Title IV, a candidacy limitation which renders 93% of union members ineligible for office can hardly be a 'reasonable qualification.'" *Id.* at 502, 88 S.Ct. at 1749.

In *Local 3489, United Steelworkers of America v. Usery,* 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977), similarly, the Court struck down as unreasonable a meeting-attendance qualification that made more than 96 percent of the union's members ineligible to hold office.

In the case at bar, by contrast, the Secretary does not contend that more than a small percentage of union members are barred from office by reason of the qualification adopted at the biennial convention in Portland. The record does not disclose the precise percentage, but the Secretary conceded at oral argument that it would be relatively small.

There has been no showing that this qualification was pushed through at the instance of an entrenched union leadership seeking to perpetuate its enjoyment of the privileges of office. The amendments were offered, rather, by a union branch from Battle Creek, and were initially opposed by the national leadership. Only after the delegate from Battle Creek had spoken in favor of the amendments, to the applause of the convention's members, did the national leadership jump on the bandwagon— and, as we have seen, the national leaders found support for their change of position in a decision that had recently been handed down by our own court, *NLRB v. U.S. Postal Service*, 841 F.2d 141 (6th Cir.1988).

Notwithstanding the observations we made in that decision about the reasonableness of prophylactic measures of the sort that have now been adopted by the two largest postal unions, an argument can certainly be made that the unions would have been better advised to reject these measures. Mr. Olds, for example, appears from his application form to be the sort of individual who would make a fine union officer. To disqualify such a person merely because he had applied for a job as postmaster might well result in depriving the branch organization of the candidate's services for a reason that the membership of that branch, knowing Mr. Olds, would not have thought should be dispositive.[2] Insofar as the amendments in question might discourage talented union members from applying for supervisory positions in the Postal Service, moreover, or might tend to result in the union's adopting more confrontational stances in its dealings with the Postal Service, the amendments would probably have had little appeal to a dispassionate philosopher-king hypothetically empowered to decide policy matters of this sort.

But we must not lose sight of the fact that the Landrum–Griffin Act was intended, first and foremost, to promote *democracy*. Democratic assemblies often adopt measures that a philosopher-king might find distasteful, just as they often fail to adopt measures that a philosopher-king would embrace without hesitation. Our role, as we see it, is not to cast our votes as if we were super-delegates at the union's biennial convention; Congress has given us a more modest assignment, that of determining whether the choice made by the democratically-elected members of the convention can be defended as "reasonable." We have little doubt that this particular choice can properly be said to meet that standard.

As we explained in *NLRB v. U.S. Postal Service*, "[u]nion shop stewards represent the Postal Service employees in grievance proceedings and have the power to settle the grievance in the initial stages of the proceedings." 841 F.2d at 143. It was in this connection, apparently, that the United Postal Workers Union saw a "potential for divided loyalty in a union officer who had also applied for a supervisory position within the Postal Service," prompting the postal workers union to adopt the 1984 amendment that made ineligible for union office any postal employee who held, accepted, or "appl[ied] for" a supervisory position. *Id.*

The postmastership application submitted by Mr. Olds illustrates quite graphi-

---

**2.** One of the great questions that representative democracies face, and to which there has never been a final or completely satisfactory answer, is how to identify the particular level within the body politic at which particular political issues can best be resolved. The individual branches of the National Association of Letter Carriers are no less democratic than the national organization, and letter carriers of a Jeffersonion bent might well believe that the qualifications of branch officers can best be decided on a branch-by-branch basis. The elected representatives of the membership of all the branches chose a more Hamiltonion approach in this instance, however, opting for a national rule, and we do not read the Landrum–Griffin Act as foreclosing that option.

cally how a union could reasonably see in such cases a potential for divided loyalty. As a union steward, Mr. Olds "worked closely" with Postal Supervisor Keith Lowe. Mr. Olds wanted to—and did—use this supervisor as a reference. Mr. Olds also secured the strong recommendation of his own immediate supervisor, Mr. Vasser, who wrote that Olds "is a fair person to deal with in settling disputes." It would not be far-fetched to suppose that a union steward who was actively seeking promotion to the ranks of management might be tempted to be ultra-accommodating in the settlement of disputes in the hope that he might thereby get good recommendations from the supervisors with whom he worked. And if the steward's application for promotion had been rejected initially, his desire for promotion could prompt him to try to curry favor with management even more assiduously.

Without casting any aspersions on the integrity of Mr. Olds, President Sombrotto testified that people who supported the amendments to the union constitution told him "many, many times ... that [they] felt that someone who was pursuing actively ... an application for a supervisory [position] would, in a case of a grievance, where a grievant may have been suspended, would make a settlement that was unfavorable to the grievant because the person was trying to toady-up to management or was being overly cooperative in a case." We certainly cannot deny that these are reasonable concerns. As Judge Herman Weber observed in an unpublished opinion upholding the reasonableness of the amendment adopted by the UPWU in 1984,

> "It is axiomatic that trustees not only must deal justly with those they represent but also must maintain the appearance that they are dealing justly. In the sensitive area of labor negotiations and representations, it is essential that the officers of defendant maintain the appearance of absolute loyalty and devotion to their constituents, to the end that when a settlement or other course of

action is suggested to the constituent by the officer, the constituent has every assurance that the settlement or suggestions are made in his or her best interests." *Brock v. Cincinnati Area Local American Postal Workers Union,* No. C–1–85–1215 (U.S. District Court, S.D.Ohio, March 9, 1988).[3]

As noted at the outset of this opinion, the Secretary of Labor takes the position—a position reflective of statutory law—that a union member who has actually become a supervisor may not be a candidate for union office and may not hold such office. 29 C.F.R. § 452.47. At one remove from this position is the qualification at issue here, which puts applicants for supervisory positions in the same boat as persons who have actually obtained such positions. The union's approach goes further than the Secretary's, but is not at odds with it. Both approaches, it seems to us, represent reasonable efforts to guard against actual or potential conflicts of interest. "The positions of the Postal Service and the union in grievance proceedings and contract negotiations are recognized to be inherently adverse," *NLRB v. U.S. Postal Service,* 841 F.2d at 145, citing *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 704, 103 S.Ct. 1467, 1475, 75 L.Ed.2d 387 (1983), and even in the case of "group leaders" who are union members and who may not be true supervisors, the Secretary's regulations recognize that conflict of interest considerations are relevant in determining whether such persons may run for union office:

> "An overall consideration in determining whether a member may fairly be denied the right to be a candidate for union office as an employer or supervisor is whether there is a reasonable basis for assuming that the person involved would be subject to a conflict of interest in carrying out his representative duties for employees and rank and file union members." 29 C.F.R. 452.47.

In some contexts, at least, the Supreme Court has made it clear that the congres-

---

3. Judge Weber's decision is in conflict with *McLaughlin v. American Postal Workers Union, Miami Area Local,* 680 F.Supp. 1519 (S.D.Fla. 1988). Like Judge Weber, we do not find *McLaughlin* persuasive.

sional authorization of "reasonable qualifications uniformly imposed" should not be given a broad reach. *Wirtz v. Hotel Employees*, 391 U.S. at 499, 88 S.Ct. at 1748. We cannot read the quoted language out of the statute, however; the Landrum–Griffin Act "does not render unions powerless to restrict candidacies for office." *Local 3489 v. Usery*, 429 U.S. at 308, 97 S.Ct. at 614. The reasonableness, and thus the legality, of a particular restriction must "be measured in terms of its consistency with the Act's command to unions to conduct 'free and democratic' union elections." *Id.* at 309, 97 S.Ct. at 614, quoting *Wirtz v. Hotel Employees*, 391 U.S. at 499, 88 S.Ct. at 1748. We see no inconsistency between that command and the restriction at issue here.

The judgment of the district court is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of the defendant union.